[L.A. No. 29953. In Bank. Mar. 12, 1973.]

HARVEY B. HIMMEL, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## COUNSEL

Harvey B. Himmel, in pro. per., and Gerald G. Wolfson for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## OPINION

**THE COURT.**—This is a proceeding under Business and Professions Code section 6083, subdivision (a) and rule 59(a) of the California Rules of Court to review a recommendation of the State Bar Disciplinary Board that petitioner, Harvey B. Himmel, be placed on probation for three years on the condition, among others, that he be suspended from the practice of law for nine months.

Himmel was admitted to practice in this state on January 9, 1952. He has been disciplined previously. In May of 1971, he was placed on probation for one year on prescribed conditions, including three months actual suspension, for signing or causing to be signed a client's name on a check knowing he lacked authority to do so, misappropriation of a client's funds, and misrepresenting certain matters.[1] The proceedings in the instant matter were initiated in June 1970 by a notice to show cause charging that Himmel had wilfully commingled clients' money with his own, misappropriated clients' funds, and deceived clients with respect to these matters. The charges related to two factually independent situations embracing two separate sets of clients. Although both matters were consolidated in the proceedings below, for the sake of clarity we shall discuss them independently.

*The Weisbaum Matter*

Mr. Leo Weisbaum was defended by Himmel in a personal injury action brought by Susan Bray, who was injured while riding in a hay wagon that

---

[1]For a complete discussion of the misconduct see *Himmel* v. *State Bar* (1971) 4 Cal.3d 786 [94 Cal.Rptr. 825, 484 P.2d 993].

was operated in connection with Weisbaum's riding stable business. After seven-and-one-half days of trial in June 1967, this suit was settled with all defendants for $7,833, with Weisbaum to contribute $2,000. It is undisputed that Weisbaum owed Himmel $1,138.50 for fees and other costs incurred in the defense of this matter.

Weisbaum testified that he was experiencing financial difficulty in the summer of 1967 and was unable to pay in full the money owed to Bray and Himmel. He stated that he withdrew $1,250 from his savings account and gave the money to Himmel in the form of a check made payable to "Harvey Himmel Trust Account" and orally instructed him that Bray was to receive $1,000 and Himmel $250 in partial settlement of their claims. Himmel, however, testified that Weisbaum and he orally agreed that the $1,250 should be applied to pay completely his outstanding legal fees and the remaining $111.50 should be held until Weisbaum could accumulate a more significant sum for transfer to Bray.

On July 14, 1967, Himmel deposited the check for $1,250 in one of his attorney's trust accounts and immediately withdrew $1,138.50 to pay his fees. Himmel testified that on July 15 and August 15 he sent Weisbaum brief office memoranda disclosing his use of the $1,138.50 for fees and indicating that he was holding $111.50 in trust for payment to Bray. Weisbaum testified that he could not recall receiving either notice. Himmel also testified that during July he notified Bray's attorney that a little over $100 was available for Bray.

Bray never received payment from either Weisbaum or Himmel. In October 1967 she filed suit against Weisbaum for payment of judgment and against Himmel to impress a constructive trust on $1,000 of his funds. Himmel answered, averring his version of the oral instructions and willingness to pay Bray $111.50. In the alternative, Himmel cross-complained against Weisbaum for recovery of $1,138.50 in legal fees. A default was entered against Weisbaum and judgment rendered for Himmel on the complaint and cross-complaint.

At the hearing before the local committee, Himmel testified that he still held $111.50 in trust for payment to Bray. His office ledger for Weisbaum reflects the deposit of $1,250, the withdrawal of $1,138.50 for fees, and a balance of $111.50. The balance in the bank account in which the $1,250 was deposited, however, dropped below $111.50 about a month after the deposit was made. Himmel testified that he had sufficient funds in other bank accounts to cover the bookkeeping balance shown on the office ledger; however, the records he produced to substantiate this claim were frag-

mentary as to the bank accounts in question and did not include records for all accounts used by Himmel to hold clients' trust funds. The records do reveal that for a total of 51 days out of the relevant period of approximately two years the aggregate balance of all accounts was less than $111.50. Twice during the period the balance remained below $111.50 for at least 14 days.

Based on the foregoing evidence, the local committee and the disciplinary board found that (1) the evidence was not sufficient to show that Weisbaum gave Himmel specific instructions concerning the disbursement of $1,250, (2) Himmel withdrew $1,138.50 for his fees,[2] (3) Himmel notified Weisbaum that $1,138.50 had been deducted for fees and that $111.50 remained in trust for Bray, (4) Himmel intentionally converted the $111.50. The record supports each of these findings.

We first note that the findings that no understanding was reached concerning the disposition of a large sum of money entrusted to Himmel by a client and that Himmel unilaterally withdrew his fees from that sum illustrate the lack of attention to clients' affairs that marked Himmel's relationship with them. Further, this loose course of conduct shows his disregard of the written and unwritten rules of professional conduct which have been designed to minimize the kind of misunderstanding that actually occurred between Weisbaum and Himmel.

■ The record also supports the finding that Himmel intentionally converted the sum of $111.50. It is conceded that Himmel never paid the money to either Bray or Weisbaum. In fact, Himmel admitted to the local committee that, "Mr. Weisbaum's money is frankly being used by me—and [has been] used . . . for some time." Based on this evidence and the absence of evidence indicating that the conversion was merely accidental or temporary, we conclude that Himmel did intentionally convert the $111.50 to his purposes and did not utilize it for the purpose for which it was entrusted to him.

*The Arrant Matter*

On numerous occasions, beginning in 1959, Mrs. Frederica Arrant and her husband Richard sought and received legal services from Himmel. The Arrants testified that in October 1965 Himmel proposed that they

---

[2]The disciplinary board found that this withdrawal was without Weisbaum's consent; the local committee found that Himmel withdrew $1,138.50 for fees "pursuant to written notice." Within the context of the findings considered as a whole this difference and other variances between the findings of the local committee and the disciplinary board are not significant.

lend money to a small blueprint firm for a short period of time of between three and six months. According to the Arrants, the name of the firm was not revealed, although Himmel did state that the company had received a contract which required immediate expansion and that a government loan obtainable in about six months would allow prompt repayment of the Arrant's loan.

Having informed Himmel that they would be willing to put $2,500 into the venture, the Arrants withdrew that amount from their savings accounts and presented the checks to Himmel. In exchange they received a promissory note payable six months after October 13, 1965, for $2,750 covering the principal amount of $2,500 plus $250 or 10 percent for interest. The note was signed "Harvey B. Himmel, Trustee" but contained no notation concerning the blueprint firm investment.

The next day, October 14, Himmel deposited the checks, totaling $2,500, in one of his attorney's trust accounts. On the same day he withdrew $2,500.25 from this account to purchase a cashier's check payable to a company called Allied Factors. Allied Factors collected accounts receivable for another company, Clarion of North America, of which Himmel was president and principal stockholder. The check, bearing the notation "Remitter L. Hirsh" represented, according to Himmel, Clarion accounts receivable paid by Hirsh and belonging to Allied Factors. On October 18 and 25 he made additional withdrawals leaving the balance in this account at minus $346.67.

In his testimony, Himmel rationalized the complete depletion of this trust account by pointing out that he maintained numerous such accounts at different banks presumably with an aggregate sum equal to or greater than the total of all funds held in trust for clients. Himmel admitted that he used some or all of these attorney's trust accounts for depositing and withdrawing funds involved in Clarion business affairs. He offered no explanation for commingling business funds and clients' trust funds and even conceded that the practice was irregular.

With respect to the Arrant investment, Himmel testified that in the late summer of 1965 he was approached by Frank Petronzio, who was connected with Western States Printing Equipment, a firm that did blueprinting and dealt in used equipment. Mr. Petronzio, who had been involved in business affairs with Himmel before, was seeking funds needed to expand Western States. Himmel agreed to make inquiries with a view to obtaining $12,000 to $15,000 in loans for Western States.

Himmel further testified that he contacted the Arrants in October 1965

and proposed that they participate in this loan transaction. He stated that he told the Arrants that the investment did involve risk but that his familiarity with the people running Western States indicated that the loan would be a good investment in the long run.

According to Himmel, the loan was actually consummated sometime in the closing weeks of 1965 when he transferred $12,000 to Western States: $7,000 from himself, $2,500 from the Arrants, and the remainder from others. His testimony does not reveal the mechanics of this transfer; no documents evidencing the transaction were produced. Himmel did state, however, that a promissory note was executed and that a lien on equipment and inventory secured the debt. Himmel's statements, however, are unclear; they raised a doubt whether these liens were ever perfected by recording.

Petronzio's testimony substantially conforms to Himmel's. Although Petronzio was aware that several investors participated in the loan, he could not recall their names nor did he produce any of the relevant documents. According to Petronzio, the bright prospects of Western States for various reasons never became a reality; accounts were lost and capital was not obtained.

Himmel testified that in April 1966, at the due date of the promissory note given to the Arrants, he informed them of the difficulties experienced by Western States. Himmel paid the Arrants the $250 interest that had accrued over the preceding six months. The deterioration of Western States continued until the summer of 1966, when it terminated its business activities. No further contact occurred between Himmel and the Arrants until January 1968 when the Arrants inquired about the status of their loan. Mrs. Arrant testified that Himmel once again related the serious difficulties of Western States but did not reveal that it had ceased to exist. She was told, however, that, in time, the sale of the equipment securing the loan would permit repayment. Himmel testified that, at this time, he explained to the Arrants that quick sale of the equipment would reduce the proceeds, but that waiting for the right buyer might permit repayment of the loans without loss.

Another year passed without significant developments. Mrs. Arrant testified that in 1969 they became concerned that the statute of limitations might completely bar recovery of their $2,500. Accordingly, on March 10 they sent a registered letter to Himmel demanding payment in full. When they did not receive a prompt reply, the Arrants contacted an attorney, Robert Ferguson, about filing suit to toll the statute. On April

14, Himmel wrote the Arrants once again pointing out the failure of the investment, recognizing a personal obligation to repay the $2,500, and indicating that payment might be possible. On June 25, with this most recent assurance unfulfilled the Arrants set a written complaint to the State Bar.

According to Himmel, this period was marked with increased pressure on Petronzio for repayment. Finally, at approximately the time of the filing of the State Bar complaint, Petronzio began to pay small amounts to Himmel. Himmel waited until he had enough money to return the $2,500 principal amount to the Arrants. He paid that amount on December 2, 1969. Then on March 24, 1970, Himmel paid the Arrants an additional $474 for the accrued interest as calculated by Mr. Ferguson.

We conclude that the virtually undisputed evidence establishes that Himmel engaged in serious professional misconduct.

First, Himmel concedes that he is guilty of intentional commingling in violation of rule 9 of the Rules of Professional Conduct. He testified that he deposited and withdrew funds generated by the operation of Clarion in bank accounts also used for clients' trust funds. The record reveals nothing to indicate that this practice was merely temporary or accidental.

Second, viewing the record as a whole, we find that Himmel conducted this investment transaction in an unprofessional way which induced unnecessary uncertainty for his clients and unduly jeopardized the safety of their money.

Himmel failed to impart to the Arrants information required for intelligent investment decisions. He revealed only the barest skeleton of the proposed investment; the name of the company, the identity of the co-investors and their relationship to Himmel, the nature of Western States operations, the circumstances which required additional funds, the prospect for financing to make possible the return of the loan, and the character of security for the loan were either not revealed or were hastily and inadequately sketched.

Even more serious was Himmel's failure to disclose that Western States ceased to operate less than a year after the loan was made. Himmel did tell the Arrants that the company had experienced serious difficulty, but by not disclosing the nature and causes of the difficulty and the facts necessary for an accurate appraisal of the prospects for repayment, he left his clients in ignorance, unable to evaluate or protect their investment.

Quite apart from the lack of disclosure, Himmel also handled the structure of the investment transaction unprofessionally and thereby induced misunderstanding and unnecessary risk. He failed to perfect the liens which secured the loan by not recording them. He failed unambiguously to define his relationship with the Arrants: was he their debtor or simply their co-investor? Finally, he failed to specify the return the Arrants were to receive on their investment. The original six-month promissory note provided for a 10 percent return for that period. The 10 percent undisputedly was paid, but when the principal amount was not repaid no new rate was defined. The additional $474 interest which the Arrants received in 1970 is certainly less than 10 percent per six months calculated on $2,500 outstanding for over two-and-one-half years. The obscurity that enshrouds the terms of the transaction, however, precludes a determination of whether the Arrants actually received their due.

In essence, Himmel failed to fulfill the high duty he owed to his clients, the Arrants. He induced them blindly to invest $2,500 in a loosely structured, ill-conceived transaction and then subjected them to extended uncertainty while their investment reached a dubious fruition. This misconduct calls into question Himmel's ability and good faith intention to perform adequately his duties as a practicing member of the bar.

The disciplinary board also found that Himmel intentionally converted the $2,500 owing to the Arrants; Himmel denies that he converted the money. We need not resolve this dispute, for whether or not Himmel's misconduct with the Arrants bears the label of "conversion," his total course of conduct, including the Weisbaum matter, amply warrants the recommended discipline. (See *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 798 [94 Cal.Rptr. 825, 485 P.2d 993].)

It is ordered that Harvey B. Himmel be suspended from the practice of the law for a period of three years; that execution of the order be stayed and that he be placed on probation for three years upon the conditions recommended by the disciplinary board including nine months actual suspension. The order shall be effective 30 days after this opinion is filed.