[L.A. No. 30261. In Bank. July 5, 1974.]

In re THEODORE A. COHEN on Disbarment.

COUNSEL

Theodore A. Cohen, in pro. per., and Richard G. Sherman for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

OPINION

THE COURT.—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar that Theodore Cohen be disbarred.

Cohen, a 43-year-old attorney admitted to practice in 1958, was convicted in 1967 on nine counts of grand theft (Pen. Code, § 487, subd. 1), and one count of conspiracy to commit grand theft and forgery (Pen. Code, § 182, subds. 1 & 4), crimes involving moral turpitude. In March 1968 we placed him under interim suspension and we denied a petition he filed the following month to set aside our order. In 1972, after the judgment of conviction was affirmed (*People* v. *Cohen*, 12 Cal.App.3d 298 [90 Cal.Rptr. 612]), we referred the matter to the State Bar on the issue of discipline.

Following an evidentiary hearing the local committee (three members) adopted findings and unanimously recommended "a Public Reproval, with no additional period of probation or suspension in view of the conviction suffered, [Cohen's] efforts toward rehabilitation, and the [interim suspension he has been under]." The disciplinary board, after receiving additional evidence concerning restitution, adopted the local committee's findings except for amendments relating primarily to the amounts of the loss and restitution, and the board (11 to 2) recommended that Cohen be disbarred.

Cohen graduated in 1958 from Southwestern Law School after attending night classes while working days. Following his admission to practice, he worked with one or more attorneys until August 1963, at which time his partnership with another attorney was dissolved and he became a sole practitioner.

Commencing about May 1964 Cohen and Jacob Fishter, a claims adjuster for State Farm Mutual Automobile Insurance Company (hereafter called State Farm), conspired to commit grand theft and forgery, and on 9 separate instances during an 18-month period beginning in July 1964

Cohen and Fishter, by means of fictitious claims, fraudulently obtained from State Farm sums ranging from $412.50 to $2,250. A doctor, whom Cohen introduced to Fishter, also participated in the fraudulent scheme. Cohen shared in the proceeds of the thefts.

As a result of the foregoing misconduct, Cohen was convicted on the conspiracy and grand theft counts. In 1971, following affirmance of the judgment, the court modified a previously imposed prison sentence by suspending its execution and placed Cohen on probation for ten years on certain conditions including, inter alia, six months in jail and restitution in such amount as the probation officer shall determine, such restitution to be secondary to Cohen's continuation of psychotherapy.[1] Cohen served the jail term in 1971 on a work furlough program.

Cohen did not testify at the criminal trial. Before a January 1968 probation report, he made erroneous and misleading statements to the probation department by which he sought to exonerate himself of any wrongdoing, and in his petition filed with this court in April 1968 to vacate the interim suspension order he similarly stated that he "has, at all times, consistently denied that he was guilty of any of the charges . . . of which he was convicted." However, on several subsequent occasions he admitted he was guilty of the offenses.

Lumbermens Mutual Casualty Company (hereafter called Lumbermens), State Farm's insurance carrier, paid State Farm $11,550 as a result of the loss from the thefts. Lumbermens recovered $5,600 of that amount from Fishter and obtained a judgment for $8,019.85 against Cohen and others. Cohen negotiated with Lumbermens and shortly before the board hearing received a satisfaction of that judgment as to him in exchange for $3,500.

Before and during the time of the offenses Cohen was having personal problems. In October 1963 a child of his born out of wedlock was killed in a fall from a second story window. After the child's death Cohen began drinking heavily and was an alcoholic during the period he committed the

---

[1]At the 1971 hearing both the prosecutor and court commented on the change of attitude they had observed in Cohen. The prosecutor stated, ". . . I have known Mr. Cohen just slightly as an attorney in the court and I have noted . . . the definite change in his attitude. I believe it is a sincere change . . . ." The court, after commenting that normally it would have no hesitation in sending an attorney to prison for defrauding an insurance company, stated, "I do feel that there has been a rather dramatic reversal of conduct on the part of Mr. Cohen. [¶] He now admits, which he did not admit at the time of trial, that he was guilty of these offenses. He has demonstrated marked repentence." The court went on to comment on various matters (e.g., Cohen's efforts to rehabilitate himself).

offenses. In December 1963 his office files were stolen; he succeeded in retrieving them about two months later by paying $12,000, part of which he borrowed.

Cohen's second marriage, which occurred in 1961, began to deteriorate by late 1963. His wife made large economic demands on him, and, according to Cohen, he felt that by permitting her to have what she wanted she would look upon him as a "big man." He was then netting $15,000 to $20,000 a year from his practice. Mrs. Cohen started dating one of his clients around March 1964. The Cohens separated that month or the next and Mrs. Cohen filed for a divorce but they were reconciled in 1965.[2]

Evidence was also introduced regarding Cohen's efforts to rehabilitate himself. It appears that in July 1968 he began attending Alcoholics Anonymous and has not had any intoxicating liquor since that time. Several members of that organization, including an attorney, testified in Cohen's behalf, stating in part that he had been a great help to them and others. A former counselor at the Alcoholism Council of Greater Los Angeles also gave testimony favorable to Cohen.

For about a year and a half commencing in October 1970 Cohen saw a clinical psychologist, Zena Malek, at least weekly.[3] Dr. Malek testified: In her opinion the crimes Cohen committed were "out of character" in that he had no history of lawbreaking and the thought of breaking the law was abhorrent to him. After the conviction he suffered extreme mental anguish. She believed his judgment was impaired at the time of the offenses by four events (the dissolution of his partnership, the death of his son, the theft of his files, and his marital problems) and by his alcoholism. Cohen improved markedly during treatment and gained considerable insight. In her opinion if he were again confronted with "these emotional problems" he would not react in the same way because he has a much better understanding of himself and is aware the "pain is too great" if he has "problems with the law." If Cohen were permitted to practice, she would be satisfied to have him represent her.

Gino Iovine, M.D., testified: He first met Cohen about a year ago after Cohen contacted him and expressed a desire to learn more about alcoholism. He has seen Cohen 15 or 20 times socially. Cohen is not the doctor's patient. He and Cohen had many "long discussions related to the alcoholic

[2]The Cohens again separated in 1970 and are now divorced. An attempted reconciliation in 1971 was unsuccessful.

[3]The visits terminated when Dr. Malek became ill. She testified that Cohen could use further treatment but that his problems are not severe and that "most people" could use treatment.

and his problems." The doctor felt that Cohen had "tremendous insight into his own problems," was in control of his alcoholism, and is now morally fit.

Cohen did legal research for attorney Richard Sherman from about September 1970 to March 1972, during which period Sherman had substantial daily contact with Cohen, and at the time of the local committee hearing (June 1972) Cohen was working for Sherman on some cases. Sherman testified that in his opinion Cohen is morally fit and that Sherman would have no reservations about Cohen's being permitted to practice law again or to handle funds of others. Sherman was familiar with the facts surrounding Cohen's conviction and presumably his background, since Sherman represented a codefendant of Cohen on appeal and represented Cohen before the local committee.

Since about October 1971 Cohen has also done legal research for attorney Richard Voorhies. Voorhies first met Cohen in 1948, worked for him in 1964 to 1966 before Voorhies' admission to practice, and saw Cohen socially during that period and afterwards. Voorhies testified that he thought Cohen was rehabilitated or "so close to being rehabilitated" that Voorhies could not tell the difference. When asked, "In terms of an ethical performance and the conduct of his practice you feel he is rehabilitated?" Voorhies replied, "I would be willing to take a chance on him." Voorhies further stated that if Cohen were permitted to practice Voorhies "would like to be associated with him as a partner." Voorhies was unaware of the prior disciplinary proceeding against Cohen (discussed hereinafter) but stated that it would not change his opinion about having Cohen as a partner because the misconduct there involved was in early 1968 and Voorhies did not think Cohen was rehabilitated by then. Voorhies was aware of the facts surrounding the crimes of which Cohen was convicted.

Several police officers testified to the change they had observed in Cohen in the early 1960's when he began to drink following the death of his son and his encountering of marital problems and to the marked improvement they had seen in him since his conviction.[4]

Carmine Iovine, the probation officer who supervised Cohen on the work furlough program in 1971, testified that he felt Cohen was rehabili-

---

[4]One of the officers further testified that Cohen had encouraged him to attend law school, that the officer was being admitted to practice, and that if Cohen were permitted to practice the officer would like to practice with him. The officer was unaware of Cohen's prior disciplinary record and indicated that whether it would affect his willingness to practice with Cohen would depend upon whether it involved moral turpitude.

tated and that he would have no hesitation in having Cohen represent him if Cohen were permitted to practice. Iovine further stated that while incarcerated Cohen started a self-realization program for other inmates, which Iovine now supervises.

Murray Barnett, a probation officer called in rebuttal by the State Bar, testified: Cohen has been under Barnett's supervision from September 1971 until the date of the hearing (June 1972), during which period Barnett spoke to Cohen for not over three hours. Cohen was under maximum supervision, which means monthly reports and "more supervision in . . . field work." Barnett felt Cohen needed maximum supervision because of the nature of the offense and "certain psychological factors in his makeup," such as his feeling discouraged because of the problems he has had with alcohol. Barnett estimated Cohen would remain under such supervision for not over six months to a year. Cohen failed to report in November 1971 but explained the next month that he had been upset over an unsuccessful attempt to reconcile with his ex-wife, had been working long hours, and "just overlooked the reporting responsibility completely." He also failed to mail in a report sent him in April 1972. That month he went to Hawaii without permission. Immediately upon his return he told Barnett of the trip and explained there had been compelling reasons necessitating his making the trip for Sherman's law firm.

In a prior disciplinary proceeding Cohen was suspended for six months in 1971. According to the findings in that proceeding, on February 23, 1968, a $757.63 check received in settlement of the claim of a client, Theodore Shapiro, was deposited in Cohen's trust account; between that date and April 30, 1968, Cohen converted the money to his own use by making withdrawals; and, despite demand by Shapiro for payment of his portion of the settlement ($470.09), Cohen did not pay him that sum until March 4, 1970 (the date of the local committee hearing). At the instant hearing Cohen offered much the same explanation as in the prior proceeding, namely that while he was confined in jail his wife brought him many documents to sign, including the settlement draft and blank checks, and he signed them so she could assist in paying his clients the amounts owed. He stated that she used Shapiro's money to pay rent and that he had not known she was going to use it for that purpose. He further stated that he admitted responsibility for "the act" because he felt "the attorney is responsible for his trust account regardless of the circumstances." He failed to reconcile his explanation with the fact that the settlement check was deposited in his trust account over a week after his release from jail and the withdrawals from that account were made thereafter.

The findings of both the board and local committee detail many of the above-recited facts and in addition state, "Cohen expressed deep remorse for his conduct, and, although attempting to explain the various reasons attributed to his conduct, was willing to accept full and complete responsibility. [¶] [Cohen] . . . now has an accurate insight into his personality problems and seems capable and competent to handle his affairs. [¶] His attitude in front of the Committee indicated he was well aware of his past indiscretions but that he now can face these problems and has overcome those which would affect his ability to practice law."

Cohen does not attack the board's findings but asserts that in view of the mitigating circumstances and the evidence of his rehabilitation, disbarment as recommended by the board majority is unwarranted.

■ The crimes of which Cohen was convicted (grand theft and conspiracy to commit grand theft and forgery) are heinous crimes and warrant disbarment in the absence of mitigating circumstances. (See *In re Bogart,* 9 Cal.3d 743, 748 [108 Cal.Rptr. 815, 511 P.2d 1167].) Here both mitigating and aggravating circumstances appear.

As heretofore appears, Cohen has a prior disciplinary record. ■ He argues that his prior record should not be considered since the misconduct there involved was after the crimes in question. The argument lacks merit. (*Lewis* v. *State Bar,* 9 Cal.3d 704, 715 [108 Cal.Rptr. 821, 511 P.2d 1173]; *Prime* v. *State Bar,* 18 Cal.2d 56, 60-62 [112 P.2d 881].) He further asserts that the misconduct there involved "was bound up with the offense[s] involved herein," since it occurred shortly after his release from a two-week stay in jail following his conviction and "doubtlessly resulted from the pressures encountered by [his] conviction and . . . incarceration . . . ." However, notwithstanding the personal pressures he was under, there was no excuse for that misconduct.

Although the explanation Cohen again gave at the instant hearing for the misconduct involved in the prior proceeding may raise some question as to his candor, especially in view of his failure to reconcile that explanation with the fact that the deposit and withdrawals were made over a week after his release from jail, neither the local committee nor board found that he was deliberately lying regarding the matter. The local committee, which heard him testify, was in a better position than we are to determine whether he lacked candor (cf. *Fielding* v. *State Bar,* 9 Cal.3d 446, 451 [107 Cal.Rptr. 561, 509 P.2d 193] [local committee in better position than this court to resolve conflicts in testimony], and it seems implicit in the local committee's findings and recommendation that it resolved that matter in his favor.

Also, as we have seen, Cohen twice failed to make reports to Probation Officer Barnett and left the state without permission. Although these probation violations cannot be condoned, it does not appear that they were of an extremely serious nature, and Barnett testified that compared with the majority of his case load Cohen's performance was "good."

As previously noted, after the local committee hearing Cohen obtained from Lumbermens a satisfaction of the $8,019.85 judgment, as to him only, in exchange for $3,500. ■ However, an attorney "'is not entitled to any indulgence by reason of restitution of moneys wrongfully retained [or taken], especially where such restitution is made merely as a matter of expediency and under pressure. (*Herrscher* v. *State Bar of California,* 4 Cal.2d 399 . . . .)' " (*Resner* v. *State Bar,* 53 Cal.2d 605, 614 [2 Cal.Rptr. 461, 349 P.2d 67].)

■ "Financial and domestic difficulties may be considered in mitigation of discipline for professional misconduct. (*Benson* v. *State Bar* . . . 5 Cal.3d 382, 388 . . . .)" (*Bradpiece* v. *State Bar,* 10 Cal.3d 742, 747 [111 Cal.Rptr. 905, 518 P.2d 337].) As heretofore appears, Cohen and his wife were separated shortly before the commencement of his criminal activities and were reconciled the next year before the termination of such activities, and apparently he was having some financial difficulties shortly before he began committing the offenses.

In addition, as found by the board and local committee, Cohen "became an alcoholic and it was during this period of time, 1964-1966, that he engaged in the conduct which brought about his criminal conviction . . . . Cohen is no longer an alcoholic and his rehabilitation seems complete in that area." The State Bar points to matters indicating Cohen was carrying on an active practice while he was an alcoholic, and the State Bar asserts that there is doubt whether alcoholism caused him to commit the offenses. Although such a doubt may exist, alcoholism at least may have been a contributing factor.

■ We note the efforts Cohen has made toward rehabilitating himself (see *Demain* v. *State Bar,* 3 Cal.3d 381, 385-386, 388 [90 Cal.Rptr. 420, 475 P.2d 652]; *In re Urias,* 65 Cal.2d 258, 261-262 [53 Cal.Rptr. 881, 418 P.2d 849]; *Hill* v. *State Bar,* 2 Cal.2d 622, 624 [42 P.2d 629]), the remorse he displayed at the instant hearings (see *Bradpiece* v. *State Bar, supra,* 10 Cal.3d 742, 748), and the favorable finding heretofore quoted regarding his present attitude. Also the confidence presently placed in him by attorneys Sherman and Voorhies indicates their appraisal that

the misconduct will not be repeated (see *Bradpiece* v. *State Bar, supra*, p. 747), and their favorable testimony and that of other witnesses is entitled to considerable weight (see *In re Jones*, 5 Cal.3d 390, 401 [96 Cal. Rptr. 448, 487 P.2d 1016]).

As hereinabove stated, the local committee, unanimously recommended that Cohen be publicly reproved; the board, by a vote of 11 to 2, recommended his disbarment. The local committee is the body which saw the witnesses and heard the testimony given for both sides. Its recommendation is entitled to great weight (see *Browne* v. *State Bar*, 45 Cal.2d 165, 170 [287 P.2d 745]), and " 'has caused us to hesitate to award the extreme penalty provided by law' " (see *Egan* v. *State Bar*, 10 Cal.2d 458, 462 [75 P.2d 67]).

 "The purpose of a disciplinary proceeding is not punitive but to inquire into the fitness of the attorney to continue in that capacity for the protection of the public, the courts, and the legal profession." (*Bradpiece* v. *State Bar, supra*, 10 Cal.3d 742, 748.) With that purpose in mind, we have concluded that the discipline hereinafter ordered is adequate.

It is ordered that Theodore Cohen's present suspension from the practice of law, which has been in effect over six years, be continued for an additional five years but that execution of this order of suspension be stayed, and he is placed on probation for that period upon the following conditions:

(1) That during the period of probation he shall abstain from the use of alcoholic beverages;

(2) That during the period of probation, he shall comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California;

(3) That during the period of probation, he shall report not later than January 1, April 1, July 1, and October 1, of each year or part thereof during which the probation is in effect in writing to the San Francisco office of the State Bar of California certifying by affidavit or under penalty of perjury to the matters specified hereinafter (provided, however, that if the effective date of probation is less than 30 days preceding any of said dates, he shall file the report on the due date next following the due date after the effective date):

(a) in his first report, he shall state (i) that he has read the State Bar Act and Rules of Professional Conduct of the State Bar of California

since the effective date of the probation; (ii) that he has complied with all provisions of the State Bar Act and said Rules of Professional Conduct since the effective date of the probation; (iii) if he is in possession of clients' funds, that he has deposited such funds in a bank or trust company, authorized to do business in California, in a bank account separate from his own account and clearly designated as "Clients' Funds Account" or "Trust Funds Account," or words of similar import (identifying the bank account), that the funds continuously were maintained in said account until properly withdrawn on behalf of the clients and that he has fully and correctly accounted for all such funds; and (iv) that he has abstained from the use of alcoholic beverages;

(b) in each subsequent report, he shall set forth each of the foregoing matters under paragraph (3), subdivision (a), with the exception of the first;

(c) provided, however, that a final report shall be filed covering the remaining portion of the period of probation following the last report required by the foregoing provisions of this paragraph (3) certifying to the matters set forth in paragraph (3), subdivision (b), hereof.

The order shall be effective 30 days after this opinion is filed.