15 Cal.3d 762 (1975)
543 P.2d 257
125 Cal. Rptr. 889
In re DAVID R. CADWELL on Suspension.
DAVID R. CADWELL, Petitioner,
v.
THE STATE BAR OF CALFORNIA, Respondent.
Docket Nos. L.A. 30449, 30450.
Supreme Court of California. In Bank.
December 22, 1975.
*764 COUNSEL
Harland W. Braun for Petitioner.
Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.
OPINION
THE COURT.
This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California in L.A. 30449 that David R. Cadwell be suspended from the practice of law for five years commencing March 11, 1970,[1] and its recommendation in L.A. 30450 *765 that he be suspended for two months upon "the effective date of the termination of the order" in L.A. 30449.[2] Cadwell was admitted to practice in 1960 and has no prior disciplinary record.

L.A. 30449
In 1969 Cadwell was convicted on two counts of grand theft (Pen. Code, §§ 484, 487) and was sentenced to prison. On March 11, 1970, we filed an interim suspension order since the offenses involved moral turpitude (see Bus. & Prof. Code, § 6102). In 1972, after the judgment was affirmed on appeal (People v. Cadwell, 4 Crim. 4191 [unpub. opn.]) and final, we referred the matter to the State Bar on the issue of discipline.
Following an evidentiary hearing by the local committee, the board received additional evidence. The board then made findings of fact, which may be summarized as follows with certain supplementary facts added thereto in brackets:
The criminal charges resulted from Cadwell's misappropriation of funds delivered to him in trust by his client, the Jack Fisher Chapter of the Disabled American Veterans (hereafter called the chapter).
The California Attorney General notified the chapter, which had not been qualified as a charitable institution, that it could not legally continue to operate certain thrift stores and that only an independent charitable organization could legally do so. The Attorney General demanded that all funds which the chapter had derived from the thrift store operation be transferred to a charitable organization and threatened to impose a receivership.
About August 23, 1967, Cadwell was retained by the chapter and paid a $7,500 retainer fee. No agreement was made as to the basis upon which fees would be charged by him for services rendered to the chapter.
At a meeting on September 5, 1967, Cadwell explained to the chapter membership the legal problems confronting the chapter and recommended that a charitable foundation be organized to operate the thrift *766 store business. At that meeting he was asked about his fees, and he stated that he would be unable to set a specific fee at that time and that there would be no fee unless the case was won or until the court authorized that he receive a fee.
The chapter's officers turned over to Cadwell $17,000 on September 11, 1967, and $38,000 on September 13, 1967, to prevent the funds from being tied up in a receivership. According to the officers, when the funds were delivered to him there was no discussion concerning the possibility of his receiving a fee from those funds, and they assumed that the funds would be deposited in a trust account.
On September 11, 1967, Cadwell opened a client's trust account and deposited therein $14,500 out of the $17,000. The remaining $2,500 was taken by him in cash. [The findings are silent as to what was done with the $2,500, and the record filed with us does not clearly establish where that money ultimately went.] Cadwell also deposited the additional $38,000 in his trust account. At various times between September 25, 1967, and March 4, 1968, he drew checks on the trust account payable to himself, cash or his office. None of the withdrawals were authorized by his client.
On January 8, 1968, at his client's request Cadwell rendered an accounting, listing legal fees, court costs, and expenses of $36,312.68. The chapter did not accept the accounting and directed Cadwell to surrender all its funds. Instead he submitted another accounting, in which he showed funds received as $62,500 (including his $7,500 retainer) and deducted, among other things, legal fees of $34,000.
In February 1968 the chapter terminated Cadwell's legal services, but he continued to be retained by a charitable foundation that had been organized to operate the thrift stores.
In his testimony before the local committee, Cadwell tried to justify his conduct on the ground that the amount taken did not exceed the reasonable value of the legal services rendered.
A civil action was brought against Cadwell to recover the money he had withdrawn from his trust account for attorney's fees. The action was brought by the Attorney General on behalf of a charitable foundation which acquired the assets of the chapter derived from the thrift store operations. Cadwell cross-complained for fees allegedly owed him. In *767 September 1974 a judgment by stipulation was entered against Cadwell for $34,000 on the complaint and in his favor for $29,000 on the cross-complaint, leaving a net judgment of $5,000 plus interest payable to the plaintiff.
During the time of the offenses, Cadwell was under considerable emotional stress as a result of his wife's suffering from severe emotional problems and becoming addicted to drugs. She attempted suicide on more than one occasion and had to be admitted to psychiatric hospitals for treatment. As a result, it became necessary for Cadwell to manage his household and care for his six children as well as carrying on his practice, which at that time was devoted entirely to representing the chapter. The increased financial responsibilities resulted in Cadwell's having no emergency funds, and he had no source of income other than from his current practice.
[Cadwell served 22 months in prison. After his release in November 1973, he worked as a paralegal in a Los Angeles law firm. A member of that firm wrote favorably in Cadwell's behalf, stating in part that he has known Cadwell about 15 years, that the offenses appeared "grossly out of character," and that Cadwell has worked for the firm about 10 months and has been "honest and trustworthy." Others, including two members of the California Legislature who have known Cadwell for many years, also wrote favorably on his behalf.]
Cadwell does not dispute any of the foregoing findings.

L.A. 30450
A notice to show cause was filed charging Cadwell with holding himself out to attorney N. Crowley as an attorney who represented John Rocha while under suspension, practicing law on Rocha's behalf while under suspension in violation of Business and Professions Code sections 6125 and 6126, and the commission of acts involving moral turpitude within the meaning of Business and Professions Code section 6106. Cadwell denied the charges.

The Evidence
Cadwell was aware at all relevant times of the suspension order filed March 11, 1970, which order has remained in effect.
*768 At the time of the alleged misconduct Cadwell was employed as a law clerk on a modest monthly salary by Lester Blanchard, an attorney who practiced with several other lawyers. John Rocha made an appointment with Blanchard's office for April 19, 1971, after Rocha's wife retained attorney N. Crowley to represent her in a dissolution of marriage proceeding.
Rocha testified that when he arrived for the appointment he was told by a receptionist that Blanchard was not there but that Cadwell was available. Blanchard testified that he "might have been there because [he] met ... Rocha right at the beginning of the case."
Rocha was taken to Cadwell's office where Cadwell talked with Rocha for about 45 minutes. After looking at documents that had been served on Rocha by Mrs. Rocha, Cadwell advised Rocha that Mrs. Rocha wanted a divorce. Cadwell obtained from Rocha information relevant to the dissolution proceeding, and Rocha signed an agreement to retain Blanchard's office in that proceeding and to pay $50 for one conference and one letter. The line for the attorney's signature was left blank on the agreement. Cadwell received $20 from Rocha and turned it over to the firm. The other $30 remains unpaid. Cadwell did not inform Rocha that he "was not an attorney," and after the interview Rocha believed Cadwell was the attorney representing him.
In April 1971, apparently after Rocha retained Blanchard's firm, Crowley received a telephone call from Cadwell, who said, "This is the office of Mr. Blanchard and my name is David Cadwell. This office will represent Mr. Rocha and we would like to discuss settlement of the real property and other issues involved." During the conversation Cadwell did not state that he was or was not an attorney, but from the conversation Crowley believed Cadwell to be an attorney. During the conversation they discussed the division of property and alimony. Crowley testified that there was "a give and take on negotiations of [the] property settlement." He thereafter testified that the parties were in "complete agreement," that the basic issue was the Rochas' house, and that Cadwell's proposals were substantially in agreement with Mrs. Rocha's position.
In May 1971 Crowley wrote Cadwell a letter, stating that Mrs. Rocha was agreeable "to the settlement which you suggested over the telephone" and that the settlement was as set forth in the letter. Crowley requested that Cadwell have Rocha sign a copy of the letter to indicate his agreement.
*769 Cadwell then sent Rocha a letter, reading, "I am enclosing a copy of a letter sent to me by [Crowley] which sets forth the proposed agreement as we have previously discussed. It seems satisfactory to this office as it is in accordance with what you have already agreed will be ... satisfactory.... [¶] If this meets with your approval, please sign the enclosed copy.... [¶] Apparently your wife is in immediate need of her son's birth certificate.... [T]here is no reason why she should not be able to remove her personal papers...."
After Rocha returned the copy, Cadwell sent Crowley a letter dated June 29, 1971, reading, "I am enclosing copy of your ... letter which ... Rocha has signed signifying his approval. This office concurs...." and the letter was signed "LESTER L. BLANCHARD [¶] BY" Cadwell. The words "Legal Assistant" or similar words did not appear by his name. According to Blanchard, Cadwell and the secretaries had been advised that the quoted term should follow Cadwell's name and Cadwell's June 29, 1971, letter may have been typed by a temporary secretary.
In August 1971 the property settlement suggested by Cadwell and embodied in Crowley's letter was approved by the court but only after the court, which presumably was aware of Cadwell's suspension, became upset over his participation in the settlement negotiations.
Cadwell never appeared in court in the Rocha case. It was in August 1971 that Crowley learned that Cadwell "was not an attorney," and the following month Crowley received a letter from Cadwell in which the term "Legal Assistant" followed Cadwell's name.
Cadwell testified: His activities in the Rocha case were "Getting all the information from the client and discussing the case with ... Blanchard, or some other attorney, and getting an agreement on how to proceed, and then doing the mechanical work of proceeding, getting out the letters and calling ... the other attorney...." Blanchard approved Cadwell's letter to Rocha before it was sent, and Cadwell would get Blanchard's "clearance" on doing anything on the Rocha case.
Blanchard testified that he reviewed the Rocha file and discussed it with Cadwell at times during the handling of the case. Also, Rocha testified that he thought at the initial interview Cadwell said he would discuss Rocha's case with Blanchard.

*770 The Findings

The board found in substance that at all relevant times Cadwell knew he was under suspension, that during the telephone conversation with Crowley in April 1971 and in the June 29, 1971, letter to Crowley Cadwell held himself out to be an attorney representing Rocha, and that Cadwell engaged in the practice of law by advising Rocha as to his legal rights and by negotiating with Crowley a settlement of the dissolution proceeding. The local committee made similar findings and concluded that Cadwell violated Business and Professions Code sections 6125 and 6126 and committed acts involving moral turpitude. The board drew no express conclusions.

Whether Evidence Supports Findings
(1a) Cadwell contends that the evidence does not support the italicized findings. (2) Although we are not bound by the board's findings and must exercise our independent judgment, the findings nevertheless are entitled to great weight. (Yokozeki v. State Bar, 11 Cal.3d 436, 443 [113 Cal. Rptr. 602, 521 P.2d 858].) (3) Charges of unprofessional conduct, however, should be sustained by convincing proof and to a reasonable certainty, and any reasonable doubts will be resolved in favor of the accused. (Nizinski v. State Bar, 14 Cal.3d 587, 595 [121 Cal. Rptr. 824, 536 P.2d 72]; Skelly v. State Bar, 9 Cal.3d 502, 508 [108 Cal. Rptr. 6, 509 P.2d 950].)
(1b) Under the foregoing standards we are satisfied that the evidence supports the finding that during the April 1971 conversation and in the June 29, 1971, letter Cadwell held himself out to Crowley to be an attorney representing Rocha. Although during the conversation and in the letter Cadwell did not expressly represent himself to be Rocha's attorney, in neither the conversation nor the letter did Cadwell inform Crowley that Cadwell was not Rocha's attorney and was instead a legal assistant, and the contents of the conversation and letter impliedly represented that Cadwell was an attorney representing Rocha.
In support of his claim that the evidence does not support the finding that he engaged in the practice of law by advising Rocha as to his legal rights and by negotiating with Crowley a settlement of the dissolution proceeding, Cadwell argues that the evidence shows that he was working as a law clerk under Blanchard's supervision and merely did what a paralegal can properly do. The State Bar asserts that the evidence *771 supports the finding  that the record shows that "in his handling of the Rocha matter, [Cadwell] clothed himself with all the authority of an attorney in his dealings with ... Rocha and... Crowley...."
We need not resolve the dispute as to the sufficiency of the evidence to support the finding in question, for whether or not that finding is supported Cadwell's course of conduct in the Rocha matter amply warrants discipline and, as hereinafter discussed, we have concluded that the over five and a half years he has been under suspension is sufficient discipline for his misconduct in the two proceedings. (See Himmel v. State Bar, 9 Cal.3d 16, 23 [106 Cal. Rptr. 638, 506 P.2d 1014].)
In the Rocha matter Cadwell violated the suspension order by holding himself out to Crowley as the attorney representing Rocha.[3] (4) "`The unauthorized practice of law includes the mere holding out by a layman [or a suspended attorney] that he is practicing or is entitled to practice law. (Bus. & Prof. Code, § 6126.)'" (See Bluestein v. State Bar, 13 Cal.3d 162, 175 fn. 13 [118 Cal. Rptr. 175, 529 P.2d 599], quoting from Crawford v. State Bar, 54 Cal.2d 659, 666 [7 Cal. Rptr. 746, 355 P.2d 490].)
(1c) Cadwell's conduct in holding himself out as practicing law while under suspension involved moral turpitude.[4] If he did not know his *772 conduct violated the order, he at the very least displayed an indifferent disregard of his duty to comply with the order. Furthermore, he must have known that he was misleading Crowley. (5) A member of the bar should not under any circumstances attempt to deceive another. (See Cutler v. State Bar, 71 Cal.2d 241, 252-253 [78 Cal. Rptr. 172, 455 P.2d 108]; McKinney v. State Bar, 62 Cal.2d 194, 196 [41 Cal. Rptr. 665, 397 P.2d 425].) "An attorney's practice of deceit involves moral turpitude." (See Cutler v. State Bar, supra.)

Discipline to be Imposed in L.A. 30449 and 30550
(6) The crimes of which Cadwell was convicted (two counts of grand theft) are serious offenses and warrant disbarment in the absence of mitigating circumstances. (See In re Bogart, 9 Cal.3d 743, 748 [108 Cal. Rptr. 815, 511 P.2d 1167].) Also, his conduct in holding himself out as practicing law while under suspension cannot be condoned.
A number of mitigating circumstances, however, appear. At the time of the crimes Cadwell had serious personal problems (see In re Cohen, 11 Cal.3d 935, 943 [114 Cal. Rptr. 611, 523 P.2d 651]; Bradpiece v. State Bar, 10 Cal.3d 742, 747 [111 Cal. Rptr. 905, 518 P.2d 337].) He has no prior disciplinary record (see In re Kreamer, 14 Cal.3d 524, 531 [121 Cal. Rptr. 600, 535 P.2d 728]; Sampson v. State Bar, 12 Cal.3d 70, 84 [115 Cal. Rptr. 43, 524 P.2d 139]), and his conduct involved in the charges that he held himself out as practicing and practiced law while suspended did not cause any individual to suffer physical or financial harm (see In re Higbie, 6 Cal.3d 562, 574 [99 Cal. Rptr. 865, 493 P.2d 97]; Himmel v. State Bar, 4 Cal.3d 786, 798 [94 Cal. Rptr. 825, 484 P.2d 993]). In addition the favorable letters by the attorney whose firm now employs Cadwell and by others are entitled to considerable weight. (See In re Cohen, supra, 11 Cal.3d 935, 943-944; In re Jones, 5 Cal.3d 390, 401 [96 Cal. Rptr. 448, 487 P.2d 1016].)
As above appears, the board's recommendation is that in L.A. 30449 Cadwell be suspended for five years commencing March 11, 1970, and that in L.A. 30450 he be suspended for two months upon "the effective date of the termination of the order" in L.A. 30449. That recommendation is given great weight. (Yokozeki v. State Bar, supra, 11 Cal.3d 436, 450; Schullman v. State Bar, 10 Cal.3d 526, 540 [111 Cal. Rptr. 161, 516 P.2d 865].)
It has now been over five and a half years since Cadwell was suspended, and we have concluded that in the light of all the facts and *773 circumstances the foregoing is sufficient discipline for his misconduct in the two proceedings.
It is therefore ordered that the suspension of Cadwell from the practice of law, directed by our order of March 11, 1970, be terminated upon the finality of this opinion. This opinion becomes final 30 days after filing. (See rule 24, Cal. Rules of Court.)
WRIGHT, C.J., Concurring and Dissenting.
I concur in the opinion of the majority that the petitioner, David R. Cadwell, should be subjected to discipline but I dissent as to the nature and extent of the discipline to be imposed. It is true that he has been suspended from the practice of law since March 11, 1970, a period in excess of five years. The majority terminates such suspension and permits petitioner to return to the practice of law after the expiration of 30 days from the filing of the opinion.
That petitioner's offenses were egregious indeed and were of a deceitful and calculated nature is apparent from the recitation thereof set forth in the majority's opinion. Whether he has been rehabilitated or not is something upon which I am unwilling to hazard a guess. In my view, petitioner should be disbarred.
Sufficient time has elapsed since the date of the interim suspension (rule 54, Rules of Proc. of the State Bar of Cal., Oct. 1972)[1] for petitioner, after an order of disbarment, to immediately seek reinstatement. Thereafter all of the safeguards specifically set forth in the Rules (see rules 43-54) come into operation. It is only "Upon an affirmative showing to the satisfaction of a majority of the entire board that the petitioner possesses the moral qualifications required to practice law in the State of California and has sufficient present learning in the law to permit him to resume practice" (rule 52) that petitioner's license may be restored to him. The public is entitled to such protection.
I would order that petitioner be disbarred.
Sullivan, J., and Richardson, J., concurred.
NOTES
[1] Eight board members so recommended. Two board members dissented on the ground the discipline is excessive. The local committee recommended that Cadwell be suspended for five years after his release from prison (i.e. until November 1978) and that he thereafter be reinstated only after he made certain restitution.
[2] Eight board members so recommended. Two board members dissented on the respective grounds that the proceeding should be dismissed and that the discipline is excessive. The local committee recommended one and a half years suspension consecutive to the suspension in L.A. 30449.
[3] Cadwell also violated that order by holding himself out to Rocha as practicing law. Cadwell did not expressly represent to Rocha that Cadwell was practicing law, but by his conduct Cadwell impliedly made such a representation to Rocha. As heretofore appears, Cadwell discussed Rocha's legal problems with him at Blanchard's law office and failed to inform Rocha that Cadwell was a legal assistant and could not lawfully practice law. Although Blanchard testified that he believed there "might" have been a sign on his office door saying "Legal Assistant" after Cadwell's name. Cadwell's testimony, read in its entirety, indicates he did not think his name was on Blanchard's door. Had Cadwell's name followed by "Legal Assistant" been on Blanchard's door, Cadwell undoubtedly would have recalled it. Even if it be assumed that the notice to show cause did not adequately charge Cadwell's holding himself out to Rocha as practicing law, Cadwell's holding himself out to Crowley as the attorney representing Rocha was charged and warrants discipline.
[4] "Moral turpitude has been defined as `"`conduct which is contrary to justice, honesty and good morals'"' (Arden v. State Bar, 52 Cal.2d 310, 321 [341 P.2d 6], quoting from Fall v. State Bar, 25 Cal.2d 149, 160 [153 P.2d 1]), and as `"`an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man'"' (In re Fahey, 8 Cal.3d 842, 849 [106 Cal. Rptr. 313, 505 P.2d 1369], quoting from In re Craig, 12 Cal.2d 93, 97 [82 P.2d 442]). The concept of moral turpitude depends upon the state of public morals, and may vary according to the community or the times, as well as on the degree of public harm produced by the act in question. `To hold that an act of a practitioner constitutes moral turpitude is to characterize him as unsuitable to practice law.' (In re Higbie, 6 Cal.3d 562, 570 [99 Cal. Rptr. 865, 493 P.2d 97].)" (Bluestein v. State Bar, 13 Cal.3d 162, 169 [118 Cal. Rptr. 175, 529 P.2d 599].)
[1] Herein referred to as "Rules."