[No. D063648. Fourth Dist., Div. One. Mar. 13, 2015.]

THE PEOPLE, Plaintiff and Respondent, v.
MELVIN JAMES ANDERSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.B., C., and D.

**COUNSEL**

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William W. Wood, Meagan J. Beale and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

A jury convicted Melvin James Anderson of residential burglary (Pen. Code, §§ 459, 460;)[1] first degree robbery (§§ 211, 212.5, subd. (a)); assault with a firearm (§ 245, subd. (a)(2)); and being a felon in possession of a firearm (§ 29800, subd. (a)(1)). The jury found true allegations that Anderson personally used a handgun within the meaning of section 12022.5, subdivision (a) in the commission of the burglary and assault, and personally used a handgun within the meaning of section 12022.53, subdivision (b) in the commission of the robbery. Anderson admitted that he had incurred three prison priors (§ 667, subd. (b)); one serious felony prior (§ 667, subd. (a)(1)); and one strike prior (§§ 667, subds. (b)–(i), 1170.12).

Anderson contends that (1) the trial court erred by failing to instruct the jury on a claim-of-right defense; (2) the court erred by admitting impeachment evidence regarding his prior gun use and possession, which the court had previously ruled inadmissible, and defense counsel rendered ineffective assistance by failing to object to the prosecution's irrelevant examination that was designed to open the door to that impeachment evidence; (3) the court prejudicially erred in allowing the prosecution to impeach him with a

---

[1] All statutory references are to the Penal Code unless otherwise specified.

23-year-old prior robbery conviction; (4) the cumulative effect of the above errors deprived him of due process; and (5) his burglary sentence should have been stayed under section 654's prohibition against multiple punishment for crimes arising out of a single act. The People concede that Anderson's burglary sentence should have been stayed under section 654. We will modify the judgment accordingly and affirm the judgment as modified.

## II.

## FACTS

At the time of the incident giving rise to the charges in this case, Anderson lived with his cousin, Kellie Thomas, and her three children. Gregory Moore and his girlfriend, Niya Watson, who is a cousin of both Anderson and Thomas, had previously lived with Thomas and her children. Moore and Watson testified that Thomas abused prescription pills, and that when they lived together, Moore occasionally provided Thomas with Vicodin pills that were prescribed for him. Thomas sometimes paid Moore money for the Vicodin pills and sometimes paid him for the pills by letting him use her electronic benefit transfer (EBT) card[2] to buy food. When Thomas's mother, Diane Sawyer, found out that Moore was giving Thomas Vicodin, she asked Moore and Watson to move out of Thomas's apartment, and paid them $200 to expedite their move.

After Moore and Watson moved out of Thomas's apartment, Moore continued to provide Thomas with Vicodin from his prescriptions, and Thomas occasionally paid Moore for the pills by letting him purchase food with her EBT card. Moore testified that he would "front" Thomas the pills and Thomas would pay him with the EBT card "about a week or so later." On March 1, 2012, Thomas met with Moore and Watson at a grocery store across the street from her residence to give them the EBT card as payment for Vicodin that Moore had given her earlier in the week. Thomas agreed to allow Moore to spend $200 on the card for food. Thomas also paid Moore $300 in cash toward an $800 debt for pills that he had given her and money that he and Watson had loaned her. After Thomas bought groceries for her household, she gave Watson the EBT card and told her that she could spend "$200 off the EBT card." Moore would normally "go right to the store" when Thomas let him use her EBT card, and would return the card to Thomas within a couple of hours. However, when Thomas gave Watson the card that day, Moore did not have time to shop because he had a "previous engage-ment" and "other things to do." Consequently, he and Watson drove home with the EBT card and Thomas walked home.

---

[2] Moore referred to the EBT card as a "food stamp card."

After Moore and Watson returned to their apartment, Anderson called Watson and asked her if she had Thomas's EBT card. Thomas later sent Moore and Watson several text messages telling them that she, Anderson, and Sawyer were on their way to Moore and Watson's apartment to retrieve the card. Thomas told Moore that they were going to bring him $200 in cash in exchange for the card.

Anderson arrived at Moore and Watson's apartment and knocked on the door. Moore opened the door with the EBT card in his right hand. Anderson said, "Yo, man. I need that card." Moore replied, "Okay, well, where is the $200?" Anderson said that he did not have the money, but would give it to Moore later. Moore told Anderson that he needed to buy food before he returned the card and turned to close the door. Anderson pushed the door open and hit Moore on the head with what appeared to Moore to be a "skull cap," which Moore explained is a "beanie that you put over your skull." The blow caused Moore to lose his balance and stumble. As he stumbled, he saw a gun clip fall out of the cap onto the floor, and saw Anderson pick up the clip. Moore then heard the sound of a clip being inserted into a gun.

Watson testified that she saw the gun clip on the floor and saw Anderson pick up the clip and insert it into a black gun. She yelled at Anderson and told him to get out of her house. In response, Anderson said, "Get the fuck out of my face. Get back. You will get hurt, too." Before he left the apartment, Anderson pushed Watson, pointed the gun at her and said, "I ought to rob you right now."

Medical assistant Shawn Ireland and a doctor were making a house call at an apartment located down the hall from Moore and Watson's apartment when the altercation between Anderson, Moore, and Watson occurred. Ireland and the doctor heard yelling and screaming coming from down the hall. The doctor told Ireland to "go break that up." Ireland went into the hallway and walked toward Moore and Watson's apartment. As he approached their door, he said something to the effect of, "Hey, hey, guys, calm down." Anderson, who was standing in the doorway, turned around and looked at Ireland. Ireland saw a pistol in Anderson's right hand. He was familiar with guns and recognized the gun in Anderson's hand as a semiautomatic "Glock" type of pistol. Anderson was holding the gun by the barrel with the handle sticking out the backside. When Ireland saw the gun, he backed away from Anderson, returned to his patient's apartment, and called 911. A few minutes later, the police arrived at Moore and Watson's apartment. Moore told the police that he had received his welfare check that day and that Anderson had probably come to his home to rob him.

*Anderson's Testimony*

Anderson testified that he lived with his cousin, Thomas, and her three children and was employed as an in-home caregiver. He testified that Thomas was a "sickly person" and is mentally "slow." He helped Thomas by making sure that she shopped for groceries for the children, got the children to school, made it to her medical appointments, and cleaned herself and the children. Thomas's mother, Sawyer, told Anderson in late 2011 that Thomas had a drug problem. Anderson tried to talk to Thomas about the problem and began to watch her more closely. Watson and Thomas told Anderson that Thomas was getting pills from Watson, and Anderson knew that Watson was getting the pills from Moore. Anderson spoke with Moore about providing Thomas with pills. He asked Moore, "Why would you guys do this to your family?" Moore responded, "I need my money. I've got to live too."

After Thomas was hospitalized in December 2011 as a result of a drug overdose, Anderson began monitoring her money. Thomas gave Anderson her bank card and EBT card, but he later returned them to her when he "noticed that she was doing better." However, he continued to monitor her use of the EBT card by asking her for receipts.

The day before the March 1 incident, Sawyer and Anderson became concerned because Thomas was missing and Sawyer discovered that money had been withdrawn from Thomas's bank account from a 7-Eleven store across the street from Moore and Watson's apartment. Anderson suspected that Moore and Watson were selling drugs to Thomas again. When Thomas came home, Anderson searched her and found Vicodin pills in her pocket. Anderson was upset. He took the pills and Thomas's cards from Thomas, but returned the cards that night.

The next day, Anderson and Sawyer confronted Thomas and asked her where the money missing from her account and her EBT card were. Thomas said that she had paid bills with the money. She pretended to look for her EBT card for a few minutes, but eventually admitted that Moore and Watson had the card. Anderson "started arguing" with Thomas and expressing disapproval that she had allowed Moore and Watson to take the card. Thomas responded, "Well, she snatched it. It was two of them and just me. What was I going to do?" Sawyer suggested that they go to Moore and Watson's apartment to retrieve the EBT card and told Thomas to "tell them we're coming to get the card." Thomas sent a text message to Moore and Watson

while Sawyer, Anderson and Thomas drove to their apartment. Anderson testified that he did not have a gun. He explained that he wore a knife attached to his belt on his right hip, and wore a cell phone holder behind the knife.

Anderson arrived at Moore and Watson's apartment and knocked on the door. When Moore opened the door, he was holding Thomas's EBT card in his hand. Anderson said, "I'm going to need that." Moore turned to Watson and asked her if he should give Moore the card. Watson said, "No, no. Hell no." Anderson reached for the card and Moore held onto it. They both pulled on the card, but Anderson won the "struggle" and left with the card.

Anderson testified that he did not hit Moore over the head with a gun or with anything else, and said that he did not own a gun. When Anderson was asked if Moore fell during the struggle, he answered, "I'm not sure what happened when I left. He was kind of, like, hurling towards the bathroom." Anderson added that Moore was not steady on his feet during the struggle and seemed "kind of scared," "slow," and "groggy." When Anderson was shown a photograph of Moore with blood on his head after the incident, he testified that he might have caused Moore to fall because Moore was unstable, but he denied that he had hit Moore on the head.

III.

DISCUSSION

A.  *Failure to Instruct on a Claim-of-right Defense*

■ Anderson contends that the trial court erred by failing to instruct the jury on a claim-of-right defense under CALCRIM No. 1863. "The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938 [90 Cal.Rptr.2d 143, 987 P.2d 168] (*Tufunga*).) However "the [claim-of-right] defense is not permitted where the claimed right to the property is rooted in a 'notoriously illegal' transaction." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1144 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Also, "[i]n furtherance of the public policy of discouraging the use of forcible self-help" (*Tufunga, supra,* at p. 950), the claim-of-right defense does not extend to "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated—as opposed to forcible takings intended to

recover specific personal property in which the defendant in good faith believes he has a bona fide claim of ownership or title . . . ." (*Id.* at p. 956.)[3]

" '[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that appellant *acted* with a subjective belief he or she had a lawful claim on the property.' [Citation.] Whether or not the evidence provides the necessary support for drawing that particular inference is a question of law. [Citation.] Although a trial court should not measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, the court need not give the requested instruction where the supporting evidence is minimal and insubstantial. Doubts as to the sufficiency of the evidence should be resolved in the accused's favor." (*People v. Barnett, supra*, 17 Cal.4th at p. 1145, fn. omitted.)

■   We conclude that the trial court properly refused the claim-of-right instruction because Anderson did not act to retrieve the EBT card from Moore and Watson with the belief that *he* had a lawful claim to the card. The claim-of-right defense is generally limited "to the perpetrator who merely seeks to effect what he believes in good faith to be the recovery of specific items of *his own* personal property." (*People v. Waidla* (2000) 22 Cal.4th 690, 734, fn. 12 [94 Cal.Rptr.2d 396, 996 P.2d 46], italics added.)

Anderson argues that he was entitled to a claim-of-right instruction under the reasoning of *People v. Williams* (2009) 176 Cal.App.4th 1521, 1528–1529 [98 Cal.Rptr.3d 770] (*Williams*), in which the Third District Court of Appeal extended the claim-of-right defense to a defendant who was tried as an aider and abettor to a principal who acted to recover property under a good faith belief that he had a right or claim to the property. The *Williams* court explained that "[i]t would defy logic and common sense to hold that a

---

[3] CALCRIM No. 1863 delineates the claim-of-right defense as follows: "If the defendant obtained property under a claim of right, (he/she) did not have the intent required for the crime of (theft/ [or] robbery). [¶] The defendant obtained property under a claim of right if (he/she) believed in good faith that (he/she) had a right to the specific property or a specific amount of money, and (he/she) openly took it. [¶] In deciding whether the defendant believed that (he/she) had a right to the property and whether (he/she) held that belief in good faith, consider all the facts known to (him/her) at the time (he/she) obtained the property, along with all the other evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith. [¶] [The claim-of-right defense does not apply if the defendant attempted to conceal the taking at the time it occurred or after the taking was discovered.] [¶] [The claim-of-right defense does not apply to offset or pay claims against the property owner of an undetermined or disputed amount.] [¶] [The claim-of-right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal.] [¶] If you have a reasonable doubt about whether the defendant had the intent required for (theft/ [or] robbery), you must find (him/her) not guilty . . . ."

defendant who absconds with goods by force under a good faith belief that he was repossessing his own property does not thereby commit robbery, but that his accomplice, who assists him in the same act and shares the same intent, may be found guilty. The latter, just as surely as the former, lacks the specific intent to deprive another of his or her property." (*Id.* at p. 1528.) Accordingly, the *Williams* court held that "a good faith belief by a defendant, tried as an accomplice, that he was assisting his coprincipal retake the principal's property negates the 'felonious intent' element of both larceny and robbery, and that an instruction on the claim-of-right defense must be given where substantial evidence supports such a belief." (*Id.* at pp. 1528–1529.)

Anderson contends that under the reasoning of *Williams*, he was entitled to a claim-of-right instruction based on the evidence that he was assisting Thomas in recovering her EBT card when he forcefully took the card from Moore. Anderson argues that if he believed the card rightfully belonged to Thomas when he recovered it, his belief would negate the specific intent required to support his burglary and robbery convictions. Anderson would thus have us hold that the claim-of-right defense extends to a defendant who acts to recover property as an *agent* of the owner of the property just as it does to a defendant who aids and abets the owner in the recovery of his or her property.[4] We decline to extend the claim-of-right defense that far.

---

[4] Anderson's trial counsel contended that Anderson was entitled to the claim-of-right instruction as Thomas's agent. Trial counsel argued: "[Anderson] was acting as an agent of [Thomas] by accompanying [Thomas] to the house, going up the elevator with [Thomas]. [Thomas] showed [Anderson] the door where Greg Moore and Niya Watson live. [Thomas] then walked down to the elevator and waited while [Anderson], as an agent for [Thomas], knocked on the door to get the EBT card."

At oral argument, Anderson's appellate counsel stated that Anderson *was not* claiming that he had acted "as an agent of a putative third party owner," but rather, that he was effectively an accomplice of Thomas, since she had "recruited" him to go to Moore and Watson's apartment with her to retrieve the EBT card. Counsel argued that *Williams* applies to this case because Thomas was a "de facto accomplice" who could have been charged with the robbery along with Anderson. Counsel admitted that Anderson's trial counsel did not make this argument to the trial court. When asked if Thomas had done anything to instigate the trip to Moore and Watson's apartment to retrieve her EBT card, counsel cited the evidence that Thomas told Anderson that Moore snatched the card from her, and that she told Anderson how to get to the apartment.

The People responded that there was no evidence that Thomas was an aider and abettor, and cited Anderson's testimony to the contrary at trial. On cross-examination, when asked whether he had admitted to the police that "it was all you," Anderson answered "yes," and admitted that he "decided to do it." He further admitted that he "asked [Thomas] to point out the apartment for [him]" and told Thomas and Sawyer to "wait off to the side" because he did not want them to be involved in his "getting the EBT card back." The record does not support Anderson's counsel's assertion at oral argument that Thomas "recruited" Anderson to retrieve her EBT card and acted as his accomplice in the commission of the charged offenses.

■ The California Supreme Court in *Tufunga* noted that "[t]he legitimacy of the need for our laws to discourage forcible or violent self-help as a remedy seems beyond question." (*Tufunga, supra,* 21 Cal.4th at p. 953.) " ' "It is a general principle that one who is or believes he is injured or deprived of what he is lawfully entitled to must apply to the state for help. Self-help is in conflict with the very idea of social order. It subjects the weaker to risk of the arbitrary will or mistaken belief of the stronger. Hence the law in general forbids it." ' " (*Id.* at pp. 952–953.) The *Tufunga* court refused to extend the claim-of-right defense to "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated" (*id.* at p. 956) in large part because doing so would be contrary to the strong public policy against self-help by force or fear (*id.* at pp. 953–956). We conclude that the same public policy similarly precludes extension of the claim-of-right defense to a defendant who has no right or claim of ownership to the property that he is accused of stealing, and who maintains that he acted as an agent of a third party who was the rightful owner of the property but was not a coprincipal in the commission of the charged offenses. To allow defendants who claim to have committed theft or robbery as agents for third parties to assert a claim-of-right defense based on the belief that the third party has a right or claim to the property taken would be contrary to the strong public policy against forcible self-help, because it would condone the type of self-help that subjects the weaker to the risk of being victimized as the result of mistaken belief or arbitrary will of the perpetrator or the third party "principal."[5] The trial court did not err in refusing to give the jury a claim-of-right instruction.

B.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.

DISPOSITION

The trial court is directed to correct the abstract of judgment to reflect that the sentence on count 1 and the firearm enhancement imposed on that count

---

[5] We do not hold that the claim-of-right defense can never be available to a defendant charged with theft or robbery where there is evidence that the defendant took the subject property on behalf of a third party whom the defendant believed to be the rightful owner of the property. There may be circumstances where the defendant acts on behalf of a third party and the rationale for the defense outweighs the public policy against forcible self-help. However, such circumstances are not present in this case.

*See footnote, *ante,* page 93.

under section 12022.5, subdivision (a) are stayed under section 654, and to forward a copy of the corrected abstract to the Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

McConnell, P. J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 24, 2015, S225914.