Filed 1/5/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

EDWARD ROBERT STARSKI et al.,

    Defendants and Appellants.

</td><td>

A145450

(Mendocino County Super. Ct. Nos. SCUK CRCR 14-79147-002, SCUK CRCR 14-79147-003)

</td></tr>
</table>

One of the more disconcerting things that can occur at a criminal trial is the discovery that there is no CALCRIM instruction for the offense charged, thus requiring the judge—hopefully with the assistance of counsel—to formulate appropriate instructions from scratch. Here, an attempted shakedown by a person who now concedes he held himself out as an attorney required Judge John Behnke to compose instructions concerning the unlawful practice of law prohibited by Business and Professions Code section 6126 (section 6126), the misdemeanor charge that was the cornerstone of felony charges of attempted grand theft and two counts of conspiring to commit those offenses that were leveled against defendant Edward Robert Starski and codefendant Larry Charles Cornett. Judge Behnke conscientiously crafted instructions that correctly recognized that violating section 6126 requires more than simply holding oneself out as an attorney, that "practicing law" entails use of that purported status. As Judge Behnke put it: "the fact that the documents that he drafted were used in a transaction or attempted transaction with [another] party . . . is what makes the difference. . . . [¶] If the jury finds that he held himself out to be a lawyer, but it didn't involve a transaction or dealing with somebody else, I don't think we would care." After receiving these

1

instructions, a jury found Starski and Cornett guilty as charged on all counts. Imposition of sentence was suspended, and each was admitted to probation upon specified conditions.

Starski contends he was the victim of instructional error, specifically that: (1) the instructions on violating, and conspiring to violate, section 6126 were "overbroad" because they allowed conviction for what a recent decision by the United States Supreme Court made protected free speech; and (2) Judge Behnke erred by refusing to give Starski's special instruction on a "claim-of-right" defense to the charges of attempting and conspiring to commit grand theft. Cornett contends the evidence is insufficient to support his conviction for conspiring with Starski to commit the unauthorized practice of law. We conclude that none of these contentions are meritorious, and therefore affirm the orders of probation.

## BACKGROUND

Cornett is married to Starski's mother.

Michael Mayfield, the president of Mendo Mill and Lumber Company (Mendo Mill), received a letter dated July 28, 2014 and addressed to him at the business address of "Mendo Mill & Lumber Co." The letterhead on the stationary was "EDWARD STARSKI, ESQ." The heading above the salutation was "NOTICE AND CLAIM FOR LOSS; PERSONAL INJURY, PREMISES LIABILITY." The body of the letter read as follows:

"This letter is being provided as notice of a legal claim. You have legal obligations beginning at the times provided herein that may require you to consult with an attorney. My office has been hired to represent Larry Cornett in his claim for loss which was initiated at your hardware store located at [address] on July 20, 2014. The incident that gives rise to this claim occurred at approximately 3:30 pm on that date, while Mr. Cornett was a customer in your store picking up his purchases. Your 'Employee Doe 1' operated a forklift as to cause a large stack of lumber to fall on my client's foot. It is Mr. Cornett's assessment that the incident resulted from the negligence

2

and incompetence of your employee and has caused severe injury and pain. My client has already suffered losses and anticipates further losses as a result of the injury.

"My client has expressed an interest in resolving this matter without the need for formal litigation in court. Therefore, I present to you a settlement offer of his losses in exchange for a release of further liability including any claims for punitive damages. It is expected and advised that you hire legal counsel in addition to providing this notice to your business liability insurance carrier. Please note that the following is a *preliminary schedule* of monetary losses as a result of the claim aforementioned, is not indicative of actual losses incurred, and may change as new information is obtained and/or further losses are incurred.

| | |
|---|---|
| "Loss of income/wages/earnings potential (utd): | $165 |
| "Out-of-pocket medical expenses (utd): | $38 |
| "Pain and suffering (utd): | $2500 |
| "Representation and legal costs (utd): | $1631 |
| "Other costs and fees (utd): | $25 |
| | |
| "Total (utd): | $4359 |

"Courtesy notice is provided that the Lake County Superior Court of California has jurisdiction in this matter, and my client contends is proper venue should this matter not be resolved informally. Please feel free to contact me by phone at [number] if you have any questions. A demand letter may be forthcoming if a resolution isn't reached.

"Regards,

"[signature]

"Edward Starski, Esq."

Mayfield commenced an internal investigation that led him to conclude no such "incident" occurred on the date and place specified in the letter. Additional investigation found "no evidence that Mr. Starski was an attorney." An employee did recall seeing Starski in Cornett's truck on the day of the alleged accident. Mayfield contacted first the Sheriff and then the District Attorney of Mendocino County. At the request of Kevin

3

Bailey, the District Attorney's chief investigator, who suspected fraud, Mayfield made a "pretext" call to Starski on August 18, 2014.[1]

At the start of the conversation, Mayfield asked Starski "so you're the attorney for Mr. Cornett? Is that right?" Starski answered: "our office is representing him." A moment later he told Mayfield: "I have to advise you that you do have the right to . . . seek legal counsel and I advise you as an attorney myself that it might be a good idea for you to do that."

After some discussion about Mayfield's position, and Starski's recent lack of contact with Cornett, Mayfield inquired: "so you as an attorney can still talk to me, right?" Starski replied, "Yes." There followed discussion about identifying the employee tortfeasor, and whether Cornett had incurred any additional expenses to those listed in the letter. Concerning such information, Starski stated that "the staff puts it in my computer here." Starski told Mayfield "I will get a letter out to you by tomorrow afternoon." Mayfield inquired whether "Edward Starski, Esquire Attorney at Law would be who one of the checks would go to and then you'd get the other part to Mr. Cornett?" Starski responded, "[t]hat would be correct."

The next communication was a letter dated August 19, 2014, again on stationary with the letterhead "EDWARD STARSKI ESQ." It was headed "Follow up to telephone conversation on August 18, 2014 Claim of Larry Cornett, Incident Date: July 20, 2014" and was addressed to Mayfield. And it read as follows:

"I am writing in continuation of our telephone conversation this afternoon. You offered, as the authorized representative of Mendo Mill & Lumber Co., to oblige Mr. Cornett's claim for $4359.00, dated July 28, 2014 in consideration of a release of liability. You also expressed an interest in some additional details regarding the incident, i.e., description/identification of 'Employee Doe 1' as presented in our Notice of Claim, and purchase receipt for the date at issue. Please find the receipt attached as ATTACHMENT A.

---

[1] The call was recorded, and the recording was played for the jury.

4

"I have since discussed the matter with Mr. Cornett and he is willing to release any and all additional claims to consideration of your proposed settlement offer. He has also provided the following description of the employee to help you identify him:

"White. Early to mid 20 year old male. About 6 feet tall with an athletic build and stubble facial hair. He worked out in the yard and drove a forklift around 3pm on July 20, 2014.

"If you would like Mr. Cornett to positively identify the employee he is willing to do so. It is also important to note that Mr. Cornett was accompanied by his son, who is also able to identify the employee.

"Please find attached a proposed Mutual Release and Settlement Agreement for your review. Again, you are encouraged to seek legal advice from an attorney but are under no obligation to do so. If you have questions please feel free to give me a call.

"Regards,

"[signature]

"Edward Starski, Esq."

The letter included a four-page "Mutual Release and Settlement Agreement" signed by Cornett, as "Claimant," and by Starski, who was identified as "Claimant's Representative."

In early September 2014, a warrant was obtained for a search of Starski's Lake County house. While the search was being conducted, Chief Investigator Bailey spoke with Starski on the telephone. Starski admitted he was not an attorney, but told Bailey he had a power of attorney for his mother and Cornett. In Starski's office in the house, a file was found with a business card for Mendo Mill stapled on the front, with a copy of the claim letter inside. Starski arrived while the search was still being conducted, and was arrested.

Bailey then went and spoke with Cornett at his house. Cornett initially stuck to the story of being injured at Mendo Mill, but, when pressed by Bailey, switched to a very different version. According to Bailey: "What he said is his foot had been injured. He couldn't recall how it had been injured, but it was not injured at Mendo Mill." Trying to

get money from Mendo Mill was not Cornett's idea, and at first he "didn't want any part of it." However, because "they were having financial hard times," and because "Starski had initiated other lawsuits, that he had won those lawsuits . . . that's why he [Cornett] looked at it as easy money." Cornett admitted signing the release Starski had sent to Mendo Mill. Four days later, Cornett recanted, and went back to his original story that the accident did occur at Mendo Mill.

Four computers seized during the search of Starski's home were examined, pursuant to a second warrant. A number of e-mails extracted from the hard drives showed Starski stating he was an attorney; others had him stating that he was not an attorney; and others that were ambiguous. A number of documents were headed "The Law Office of Edward Starski." Also recovered were two "complaints" for filing in the Lake County Superior Court with one or both Cornetts as plaintiffs, but both ending with a space for the signature of "Edward Starski, Esq. Plaintiff in Pro Per."

At trial, the jury was told the parties stipulated that Starski "is not [an] . . . attorney licensed to practice law in the State of California."

Defendant Starski, who was representing himself, called the wife and two children of Cornett (who were also his mother and half-siblings) to testify that Cornett did suffer an injury at Mendo Mill. Cornett's wife testified that she did provide her son with a power of attorney (also characterized by Starski as "attorney in fact" and "a general durable power of attorney") because there were situations when he could act for her when she could not, such as negotiating with her "mortgage holder." This was also the reason for Starski having a power of attorney from Cornett.[2]

Starski testified in narrative form that he went to the Cornett house on the evening of July 21 in response to an e-mail from his mother. Cornett had "an injury to his foot." "And based on my discussion with both my stepfather and my sister [i.e., Charlene Cornett] . . . I was led to believe that there was an injury at Mendo Mill." His use of the

---

[2] A power of attorney is statutorily required to be in writing and executed by the party granting it. (Prob. Code, §§ 4401–4402.) No such writing was produced at trial.

6

abbreviation "Esq." for "Esquire" is of long standing and has, in part, a religious derivation.[3]

Under cross-examination by co-defendant Cornett's counsel, Starski testified he was "not licensed to practice law in California" or any state. He did go to law school, which he identified as the "University of Colorado, Sturm College of Law,"[4] but he attended for only one year and did not graduate. He had filed "a significant amount" of lawsuits, but fewer than fifty. He supports himself doing "freelance paralegal work." He is a licensed paralegal in Colorado.

Starski further testified that when he was told of Cornett's accident at Mendo Mill, he went to their home, took photographs of the injury, and told Cornett: "You can't file a lawsuit against somebody if you don't have any damages." He did prepare the demand letter—before he spoke to Mayfield—that was sent to Mayfield at Mendo Mill. Starski also prepared the settlement agreement. Cornett was not with Starski when he spoke with Mayfield on the monitored "pretext" call, when Starski did identify himself as Cornett's attorney, by which he meant that he was acting pursuant to a power of attorney given him by Cornett. Starski testified that even armed with a power of attorney, "which labels me attorney in fact," "I'm not an attorney at law." Indeed, "I'm very careful never to refer to myself as an attorney at law." Nevertheless, immediately thereafter he testified: "It is my belief that that under statute I'm authorized as a layperson to act as the attorney for

_____

[3] "I've used the title esquire for several years. Actually, I started using it when I was a member of the Knights of Columbus within the Catholic Church. I have recently adopted a new organization that I participate with called New Universal Spirit. We're Christian druids. . . . We're basically Christians that practice the Christian faith. What we rely a lot on is Genesis, being stewards of the earth. [¶] [In my] family, Christian druids, esquire is a title that's bestowed upon me through that organization, as it was when I was part of the Knights of Columbus at the Catholic Church. [¶] I have used that name [*sic*] every time I sign personal letters, professional letters. It's on all my letterheads. It's on my checkbook. . . . Every time that you see my name on anything, that has the title esquire on it." At a later point in his testimony, Starski stated: " 'Esquire' is a title of nobility that's not allowed to be regulated by any law."

[4] This was not correct: Sturm College of Law is a part of the University of Denver, not the University of Colorado.

someone I hold the power of attorney for." As for Cornett, "He knew that I was representing him," but only to the extent of writing letters, not filing anything.

Starski testified he makes approximately $2,000 per month from his freelance paralegal work, and "in excess of $50,000" annually for the lawsuits he has filed, commencing in 2012. "I would say I succeed in more than 90 percent of the lawsuits I file." Asked by the prosecutor whether he believed by reason of the power of attorney from Cornett "you're authorized to draft legal documents for him," Starski responded "no." Starski did not see how his references to being "an attorney myself" to Mayfield and others could be construed as holding himself out as an attorney at law.

## DISCUSSION

### There Is Substantial Evidence to Support Cornett's Conviction for Conspiracy to Commit the Unauthorized Practice of Law

We first address Cornett's contention that his conviction for conspiring with Starski to commit the unauthorized practice of law is not supported by substantial evidence. The nature of the crime of conspiracy significantly impacts our substantial evidence analysis.

"As a general rule, a conspiracy can only be established by circumstantial evidence 'for, as the courts have said, it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts, bearing more or less closely or remotely upon the common design [citation]; and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citing authority), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy (citing authority).' [Citation.]" (*People v. Steccone*, (1950) 36 Cal.2d 234, 237–238.) The trier of fact "may consider the events that occurred 'at or before' or 'subsequent' to the formation of the agreement. From the proof of the occurrences beforehand and at the time of the agreement linked with evidence of the overt acts." (*People v. Kobey* (1951) 105 Cal.App.2d 548, 562.)

8

And "[w]hile it is true that mere association with the perpetrator of a crime does not prove criminal conspiracy, it is a starting place for examination." (*People v. Manson* (1976) 61 Cal.App.3d 102, 126.) "[T]he entire conduct of the parties, their relationship, acts, and conduct . . . may be taken into consideration by the jury in determining the nature of the conspiracy." (*People v. Lewis* (1963) 222 Cal.App.2d 136, 144.)

The overt acts alleged were drafting and sending the demand letter from Starski to Mayfield, and the "pretext" telephone conversation between Starski and Mayfield. Cornett notes that he never communicated directly with Mendo Mill, did not live with Starski, and was never expressly told by Starski that "he [Starski] identified himself to Mayfield as an attorney." And thus Cornett concludes, "the prosecution presented no evidence demonstrating [he] agreed with Starski to commit the unauthorized practice of law, or intended that Starski do so."

The legal standards quoted above show that Cornett is setting up an evidentiary burden the law does not impose. And thus we do not agree with his ultimate conclusion.

Despite their living at separate addresses, the association between Starski and Cornett was hardly fleeting. The connecting bond is Starski's mother, who has also been Cornett's wife since 2007. Viewing the evidence and possible inferences most favorably to the jury's verdict (see, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 638–639), several scenarios are possible. Under one, the predicate is that the jury concluded there was no accident at Mendo Mill on July 20, 2014. At some point before the demand letter was dispatched, Starski and Cornett decided to use the fictitious accident to get money from Mayfield. Another scenario is that Cornett did suffer injury to his foot at Mendo Mill on July 20, 2014, but it was nowhere as severe as made out in the demand letter. Depending on how the jury chose to interpret Bailey's unrecorded interview with Cornett, his claimed injury was either nonexistent or grossly inflated in magnitude.

Whether agreement to seek unjustified money from Mendo Mill originated before Cornett's trip to Mendo Mill on July 20, 2014 is irrelevant. Equally immaterial is whether the idea was the brainchild of Cornett, a third party, or—as seems more

9

likely—Starski. All that the jury was required to find, and which we must assume it did find, was that such agreement existed prior to the overt act of sending the July 28 demand letter to Mayfield.

The mailing of that letter can be assumed to have had Cornett's assent. Stronger evidence of his participation in the scheme may be readily inferred from his signature on the "Mutual Release and Settlement Agreement."

We must also accept that the jury credited Bailey's version of his unrecorded conversation with Cornett. From that version, with Cornett's knowledge of Starski's having "initiated" and "won" a number of lawsuits, the jury could conclude that Cornett knew that Starski had a history of successfully posing as an attorney at law in dealings with third parties. By agreeing to become the latest of Starski's "clients," and by agreeing to let Starski "represent" him and speak in his name to Mayfield, the jury could ultimately conclude that Cornett was a knowing participant in Starski's unauthorized practice of law.

### The Instructions on Violating Section 6126 and Conspiracy to Violate Section 6126 Were Not Overbroad and Did Not Infringe Starski's Right of Free Speech

The jury was instructed as follows:

"Defendant Starski is charged in Count 4 with the unauthorized practice of law in violation of Business and Professions Code section 6126. To prove that the defendant Starski is guilty of this crime, the People must prove that:

"Defendant Starski in a transaction or attempted transaction with a third party or business entity held himself out as practicing law or entitled to practice law or engaged in the practice of law; and

"Defendant Starski did so while not an active member in good standing with the California State Bar.

"The fact that a person uses the term 'Esquire' after his name is not sufficient to show that the person held himself out to be entitled to practice law."

10

Judge Behnke also instructed the jury with a modified version of CALCRIM Nos. 3406, 3407, and 3411 on mistake of fact and law[5], and with a special instruction on Starski's status under a power of attorney.[6]

[5] "A defendant is not guilty of unauthorized practice of law if he did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact. [¶] If the defendant Starski's conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit the crime of unauthorized practice of law. [¶] If you find that the defendant believed that he was authorized to represent to Mike Mayfield, in connection with Mr. Cornett's claim that he was an attorney and if you find that his belief was reasonable, he did not have the mental state required for the crime of the unauthorized practice of law. [¶] If you have a reasonable doubt as to whether Mr. Starski had the mental state required for the crime of unauthorized practice of law, you must find him not guilty of that crime." (CALCRIM. No. 3406 Mistake of Fact (Modified).)

"It is not a defense to the crimes charged that a defendant did not know he was breaking the law or that he believed his conduct was lawful." (CALCRIM No. 3407 (Mistake of Law).)

"As I've already explained, it is not a defense to the crime of unauthorized practice of law that the defendant did not know he was breaking the law or that he believed his act was lawful. But when you consider the crime of conspiracy, a different rule applies. [¶] Conspiracy requires that a defendant act with a specific intent. The act and specific intent is explained in the conspiracy instructions. [¶] A defendant is not guilty of conspiracy to commit the unauthorized practice of law if he made an honest and good faith mistake about the law, if that mistake shows that he did not have the specific intent required for the crime of conspiracy. [¶] If you have a reasonable doubt whether defendant had the specific intent required for this crime, you must find him not guilty." (CALCRIM No. 3411 (Mistake of Law as a Defense (Modified).)

[6] "Powers of attorney are discussed in California Probate Code beginning at Section 4000. [¶] Probate Code section 4014 describes an attorney in fact as a person that is granted authority to act for the principal. [¶] Probate Code section 4022 defines power of attorney as a written instrument that is executed by a natural person having the capacity to contract and that grants authority to an attorney in fact. [¶] Probate Code section 4121 sets forth a number of technical requirements for the sufficiency of a power of attorney, including a requirement that it be acknowledged before a notary public or signed by at least two witnesses. [¶] An attorney in fact may act for the principal consistent with the terms of the power of attorney. Under Probate Code section 4204, an attorney in fact acting pursuant to a power of attorney is entitled to reasonable compensation for his services and to reasonable expenses incurred as a result of acting as attorney in fact. [¶] Probate Code section 4459 provides in part that a statutory form

11

As previously mentioned, Starski represented himself, and thus was present during discussions regarding the instructions the jury would be given. The prosecutor requested a special instruction, but that request was withdrawn when Judge Behnke explained the special instructions he drafted that were ultimately used.[7] Starski also proposed a special instruction.[8] Starski expressly approved of Judge Behnke adding the language concerning the word "esquire," which amounted to a pinpoint instruction for the defense.

Starski, joined by Cornett, now contends the special instructions were "overbroad" because "What is missing . . . is any definition [of] what constitutes the practice of law. . . . [S]imply letting someone else believe one is licensed to 'practice law' is insufficient absent some evidence of a fraudulent claim or representation that one is

_____

power of attorney, the language with respect to claims and litigation empowers the agent/attorney in fact to submit to arbitration, settle and propose or accept a compromise with respect to a claim or litigation. [¶] By executing a statutory form power of attorney, a principal, pursuant to section 4450(a) of the Probate Code empowers an attorney in fact to demand, receive and obtain by litigation or otherwise money to which the principal is entitled. [¶] Nothing in the Probate Code authorizes an attorney in fact who is not a licensed attorney at law to hold himself out to be an attorney, to practice law or to charge for the provision of legal services by the attorney in fact."

[7] The prosecutor's proposed instruction read: "It is unlawful to practice law in California unless one is an active member in good standing of the California State Bar. . . . [¶] A person is guilty of committing the unauthorized practice of law if that person: [¶] (1) Is not a member in good standing of the state bar; and [¶] (2) Either: [¶] (a) Holds himself or herself out as being entitled to practice law in the course of conducting business related to the practice of law; [¶] or [¶] (b) Actually practices law. [¶] The practice of law includes 'the doing and performing [of] services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure[,]' rendering 'legal advice and legal instrument and contract preparation, whether or not these subjects were rendered in the course of litigation.' " [incorporating quotes from *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 128 (*Birbrower*)].

[8] " 'The Defendant is charged in Count ___ with the unauthorized practice of law. To prove that the Defendant is guilty of this crime, the People must prove that: [¶] 1. Defendant knowingly and intentionally engaged in the practice of law; [¶] AND [¶] 2. Defendant did so while not a member in good standing of the California State Bar.' "

12

authorized to perform services in a court of law, and that was not explained in these instructions."[9]

Starski also detects a constitutional defect. Although he now "freely admit[s] to creating an illusion he was a licensed attorney when he clearly is not, the United States Supreme Court has made it clear that such false or misleading speech still falls within the protection of the First Amendment."[10] As Starski sees, it, *United States v. Alvarez* (2012) ___ U.S. ___ [132 S.Ct. 2537] (*Alvarez*), wrought a fundamental shift in what could be criminalized by section 6126. In his words: "The older case law holding that the unauthorized practice of law 'includes the mere holding out by a layman or a suspended attorney that he is practicing or is entitled to practice law' (e.g. *In re Cadwell* (1975) 15 Cal.3d 762, 771) must be reexamined in light of *Alvarez, supra*. There would be no constitutional infirmity in this statute if the definition of the practice of law were limited to ' "the doing and performing services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure." ' (*People v. Merchants Protective Corp*. (1922) 189 Cal. 531, 535.) But *Merchants* and the cases that have followed included in its definition legal advice and legal instrument and contract preparation, whether or not these subjects were rendered in the course of litigation. [¶] This definition of the unauthorized practice of law to include any legal advice or counsel, and the mere preparation of legal instruments, is no longer viable in modern day society with the advent of the Internet."

---

[9] Starski states he "does not contend the statute [section 6126] itself is overbroad but simply that the trial court's instructions on this offense were an overbroad interpretation of the law." This attempted distinction is not tenable. If, as Starski believes, conviction requires "evidence of a fraudulent claim or representation that one is authorized to perform services in a court of law," such a requirement is valid only if it reflects statutory language. If the instructions are overbroad because they do not state that requirement, so is section 6126.

[10] Starski thus abandons his trial claim that he was not holding himself out as an attorney. He also abandons defending his actions as legitimate exercise of his authority under the power of attorney from Cornett.

"Thus, the issue becomes whether appellant's creation of an illusion that he held a license to practice law, to a third party when presenting a claim for damages with the obvious hope the personal injury claim would receive greater weight, was sufficient under this statute [i.e., section 6126].  Appellant contends it is not absent proof that he had knowledge the claim was false . . . ."

Starski is wrong:  neither of his arguments is persuasive.

"Although trial courts, generally, have a duty to define technical terms that have meanings peculiar to the law, there is no duty to clarify, amplify, or otherwise instruct on commonly understood words or terms used in statutes or jury instructions.  'When a word or phrase " 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " ' " (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022–1023.)

As Starski concedes, almost a century has passed since our Supreme Court said this:  "The phrase 'practicing law,' or its equivalent, 'the practice of law,' has long had a sufficiently definite meaning throughout this country to be given a place in both constitutional and statutory law without further definition." (*People v. Merchants Protective Corp., supra,* 189 Cal. 531, 534.)  " '[A]s the term is generally understood, the practice of the law is the doing and performing services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure.  But in a larger sense it includes legal advice and counsel and the preparation of legal instruments and contracts by which legal rights are secured although such matter may or may not be depending in a court.' " (*Id.* at p. 535.)

Our Supreme Court has also repeatedly held that purporting to represent someone, even if only impliedly, while negotiating a settlement is likewise included within the practice of law.  (*Birbrower*, *supra*, 17 Cal.4th 119, 131; *Morgan v. State Bar* (1990) 51 Cal.3d 598, 603–604; *In re Cadwell*, *supra,* 15 Cal.3d 762, 770 ["Although during the conversation and in the letter Cadwell did not expressly represent himself to be Rocha's attorney, in neither the conversation nor the letter did Cadwell inform Crowley that

Cadwell was not Rocha's attorney . . . , and the contents of the conversation and letter impliedly represented that Cadwell was an attorney representing Rocha."].)  We have no doubt that modern day jurors are just as knowledgeable as to the scope and concept of the practice of law as they were 90 years ago.  Thus, Judge Behnke had no duty to amplify or clarify the nontechnical term "unauthorized practice of law" without a request by Starski, which he did not make.  (*People v. Griffin*, *supra*, 33 Cal.4th 1015, 1022–1023.)

As for Starski's argument that "simply letting someone else believe one is licensed to 'practice law' is insufficient absent some evidence of a fraudulent claim or representation that one is authorized to perform services in a court of law," it is refuted by the same Supreme Court decision that explained "unauthorized practice of law."  And sensibly so.  Starski's argument would exempt persons who never enter a courtroom or act without a fraudulent purpose.  (See *Morgan v. State Bar*, *supra*, 51 Cal.3d 598, 603 [" '[t]he cases uniformly hold that the character of the act, and not the place where it is performed, is the decisive element' "].)  Unlicensed persons who negligently drafted wills, trust instruments, or partnership agreements would never face prosecution.  And the person who acted in the sincere belief that he or she was protecting or promoting the client's best interests would be immune from criminal consequence.

"The prohibition against unauthorized law practice . . . is designed to ensure that those performing legal services do so competently."  (*Birbrower, supra*, 17 Cal.4th 119, 127; cf. *Gerhard v. Stephens* (1968) 68 Cal.2d 864, 918 ["California prohibits the unlawful practice of law . . . to afford protection against persons who are not qualified to practice the profession"].)  But competency plays no part in how Starski's defining the unauthorized practice of law solely in terms of intent or locale.

Starski also argues that a simple statement of erroneous fact (i.e., "I am a lawyer") enjoys First Amendment protection, and cannot be criminally actionable unless tied to "a fraudulent claim or representation that one is authorized to perform services in a court of law."  Unfortunately, this argument did not evoke a response by the Attorney General, which is regretted.  But Starski's constitutional argument is easily defeated.

15

It appears that until now the issue was treated as settled because of a single, somewhat peremptory sentence in 1975: "The constitutional protection for free speech does not extend to the delivery of legal . . . advice by persons not licensed to give such advice." (*Howard v. Superior Court* (1975) 52 Cal.App.3d 722, 726.) Perhaps, like one of Newton's laws, the principle was deemed so obvious that it only had to be stated once to command universal acceptance. Starski thinks *Alvarez* now threatens that consensus. We do not.

In *Alvarez*, a majority of the United States Supreme Court invalidated a federal statute that made it a crime to falsely claim to be a recipient of the Medal of Honor. In what the dissenters excoriated as " 'self-aggrandizing fabrications' " (*Alvarez, supra,* [132 S.Ct. 2537, 2563] (dis. opn. of Alito, J.)), Alvarez stated at a public meeting of his local water board: " 'I'm a retired marine of 25 years. I retired in the year 2001. Back in 1987, I was awarded the Congressional Medal of Honor. I got wounded many times by the same guy.' " Justice Kennedy, writing the plurality opinion, noted that "None of this was true" and that "[l]ying was his [Alvarez's] habit." Alvarez's statements "were but a pathetic attempt to gain respect that eluded him. The statements do not seem to have been made to secure employment or financial benefits or admission to privileges reserved for those who had earned the Medal." (*Id.* [132 S.Ct. at p. 2542] (plur. opn. of Kennedy, J.).) The Stolen Valor Act (18 U.S.C.S. § 704) was struck down as an overbroad "content-based suppression of pure speech, speech not falling within any of the few categories of expression where content-based regulation is permissible." (*Alvarez, supra,* [132 S.Ct. at pp. 2543, 2551].) The plurality of four was joined by two other justices employing a different approach. (*Id.* [132 S.Ct. at p. 2551] (conc. opn. of Breyer, J.).)

Justice Kennedy for the plurality noted that "content-based restrictions on speech have been permitted, as a general matter, only when confined to the few ' "historic and traditional categories [of expression] long familiar to the bar," ' " one of which was "speech integral to criminal conduct, see, e.g., *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)." (*Alvarez, supra,* [132 S.Ct. 2537, 1544].) The citation of *Giboney*

16

is doubly significant.  First, because it was there that a unanimous Supreme Court stated: "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (*Giboney v. Empire Storage & Ice Co.*, *supra*, at p. 502.)  And second, because this quote from *Giboney* was used, in a landmark decision concerning state regulatory power over the practice of law, as support for the conclusion that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity."[11]  (*Ohralik v. Ohio State Bar Assn*. (1978) 436 U.S. 447, 456.)  Elsewhere in that decision the court referred to " '[t]he interest of the States in regulating lawyers is especially great,' " particularly when joined with "the need for prophylactic regulation in furtherance of the State's interest in protecting the lay public." (*Id*. at pp. 460, 468.)

The United States Supreme Court has repeatedly, and fairly recently, emphasized that " 'States have a compelling interest in the practice of professions within their boundaries, and . . . as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions.' " (*Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 625 and decisions cited.)  Starski's reading of the First Amendment would turn *Alvarez* on its head, for it would immunize the very situation Justice Kennedy described as beyond the pale of the First Amendment, speech that was "integral to criminal conduct"—which is a perfect thumbnail description of Starski's scheme to obtain money from Mendo Mill.  We think there is absolutely no doubt the six members

---

[11] Because it was never shown that Starski asked for, or received, money from Cornett, and because money was not involved in *Alvarez*, he does not claim he was exercising his right to "commercial speech."  But even if dollars were sought or received by Starski, that would have no impact on California's regulatory power.  (See *Zauderer v. Office of Disciplinary Counsel of Supreme Court* (1985) 471 U.S. 626, 638 ["The States . . . are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading"]; *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 563–564 ["The government may ban . . . commercial speech related to illegal activity"].)

of the *Alvarez* majority had any intention of eviscerating so significant an aspect of a state's traditional power. Indeed, the *Alvarez* plurality might have foreseen Starski's claim when it stated: "Where false claims are made to effect a fraud or secure moneys . . . , it is well established that the Government may restrict speech without affronting the First Amendment." (*Alvarez, supra*, [132 S.Ct. 2537, 2547].)

## The Trial Court Did Not Err in Refusing to Give Starski's "Claim Of Right" Special Instruction

Judge Behnke refused to instruct the jury with this special instruction requested by Starski: " 'If you have reasonable doubt about the prosecution's claim that an injury did not occur at Mendo Mill, you must find the Defendants not guilty of attempted grand theft and not guilty of any conspiracy to commit grand theft.' " Characterizing this as a "claim of right instruction," Starski, again joined by Cornett, contends it was erroneously denied.

Starski's characterization is puzzling, if not inaccurate. "The claim-of-right defense is generally limited 'to the perpetrator who merely seeks to effect what he believes in good faith to be the recovery of specific items of *his own* personal property.' " (*People v. Anderson* (2015) 235 Cal.App.4th 93, 100.) The proposed instruction as submitted made no mention of, and gave no obvious indication of being tied to, the "claim-of-right" concept. (Cf. CALCRIM No. 1863 [claim of right applies to obtaining "specific property" and "does not apply to . . . claims . . . of an undetermined or disputed amount"].) Moreover, our Supreme Court has indicated the claim-of-right defense does not apply to situations involving sums representing an "unliquidated tort claim for personal injuries" or "a rough estimate of a disputed debt." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1144, 1146, citing *People v. Poindexter* (1967) 255 Cal.App.2d 566, 570.) That certainly seems to describe the situation here, where the parties were still ostensibly negotiating about the amount of "compensation" Mendo Mill was willing to pay Cornett. Thus, there was no actual retaking of property, or even an attempted retaking, given that negotiations were still ongoing. So neither defendant could say his property had been wrongfully taken.

18

Starski thinks he had a property interest, personal to him and independent of Cornett, in recovering his "costs" incurred in prosecuting Cornett's claim against Mendo Mill. But this derivative interest of Starski as agent cannot be untethered from the interest of Cornett as principal. So, just as with the amount of Cornett's "damages," the amount of "costs" had not been agreed but was still being negotiated. Starski's belief that he possessed an independent property interest fails because the claim-of-right defense does not apply to efforts "to satisfy, settle, or otherwise collect on a debt, liquidated or unliquidated," the theory being " '*The law does not contemplate the use of criminal process as a means of collecting a debt. To invoke such process for the purpose named is, as held by all authorities, contrary to public policy. Hence, good faith, or the fact that the end accomplished by such means is rightful, cannot avail one as a defense in such prosecution, any more than such facts would constitute a defense where one compels payment of a just debt by the threat to do an unlawful injury to the person of his debtor.*' " (*People v. Tufunga* (1999) 21 Cal.4th 935, 956.) Moreover, the claim-of-right defense is withheld from arising from " 'notoriously illegal' transaction," which, given its long existence, would cover the unlawful practice of law. (See *id.* at p. 953, fn. 5.)

Finally, "[a] trial court . . . has a duty to instruct on . . . a particular defense only if it appears the defendant is relying on such a defense, or substantial evidence supports the defense and it is consistent with the defendant's theory of the case." (*People v. Booker* (2011) 51 Cal.4th 141, 179.) Starski's testimony can be read from beginning to end without a hint that he was relying on a claim-of-right defense, which is no surprise, because such a defense would have been completely inconsistent with his theory that he did absolutely nothing wrong.

For each and all of the above reasons, refusing this special instruction was not error.

## DISPOSITION

The orders of probation are affirmed.

19

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


A145450; *P. v. Starski*

Trial Court:    Mendocino County Superior Court

Trial Judge:    Hon. John Behnke

Counsel:

Marylou Hillberg, under appointment by the Court of Appeal for Defendant and Appellant Edward Robert Starski.

Jeffrey S. Kross, under appointment by the Court of Appeal for Defendant and Appellant Larry Charles Cornett.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, Sara Turner, Deputy Attorney General for Plaintiff and Respondent.